**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ron LaFRAUGH, Defendant–Appellant.**

No. 89–8141
**Non–Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 29, 1990.

Thomas J. Waldrop, Federal Defender Program, Inc., Atlanta, Ga., for defendant-appellant.

Janet F. King, Robert F. Schroeder, Asst. U.S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before HATCHETT and EDMONDSON, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

The appellant, Mr. Ron LaFraugh, appeals certain rulings used by the district court to determine the length of his sentence under the Federal Sentencing Guidelines. On February 8, 1989, the district court sentenced Mr. LaFraugh to forty-one months incarceration, and imposed a three-year term of supervised release. The court also ordered Mr. LaFraugh to pay a special assessment of $50.00 on each count, and restitution in the amount of $2,526.78. We affirm.

## FACTS

In May, 1988, Mr. John Vanucci, the regional security manager at the U.S. Sprint Corporation ("Sprint") received information from Mr. Ron Kaufman, a customer of U.S. Sprint, regarding the unauthorized sale of U.S. Sprint long distance access code numbers. Mr. Kaufman explained that an individual named Ms. Linda Duntley had provided him with two U.S. Sprint long distance access codes for a fee of $125.00 a month; she also informed him that she would provide him with new access codes on a daily basis for unlimited long distance telephone service. Based on this information, Sprint initiated an internal investigation, and learned that from between March 15, 1988 and May 2, 1988, callers had used a total of 57 different long distance access code numbers to make approximately 400 calls from Ms. Duntley's telephone. Sprint brought the results of this investigation to the attention of the United States Secret Service, who obtained a search warrant for Ms. Duntley's business establishment.

The Secret Service executed the warrant on May 27, 1988, and, during the search, found in excess of two hundred and fifty U.S. Sprint access code numbers, indicating an extensive use of these numbers without the knowledge or authorization of Sprint. The search also disclosed Ms. Duntley's answering machine, which in turn revealed that Mr. LaFraugh was the source of these numbers.

In a subsequent interview, Ms. Duntley explained that Mr. LaFraugh first contacted her in the summer of 1987, and that she began purchasing long distance access code numbers from him beginning in December, 1987, or January, 1988. Mr. LaFraugh apparently convinced Ms. Duntley that he (and others) had purchased these numbers from Sprint, and that the numbers still had a number of minutes left on them. Ms. Duntley paid the appellant $100.00 per month, and for that fee she was able to make unlimited telephone calls.

On occasion, Ms. Duntley also received numbers from Mr. Roger LaFraugh, the appellant's brother, from Ms. Marti Matsom, the appellant's girlfriend, from an in-

dividual named Tom, and from an individual named Stephen Hayes in New York. Mr. LaFraugh furnished Ms. Duntley with Tom's telephone number; Tom apparently furnished her with the number of Mr. Hayes. Ms. Duntley also introduced her boyfriend to the appellant, and the appellant sold him access code numbers as well.

Thus, as a result of these revelations, Special Agent Dennis Morgan, acting in an undercover capacity and using the name "Lee Murphy," asked Ms. Duntley to contact the appellant, and to have the appellant contact him. On June 7, 1988, Mr. LaFraugh contacted Mr. Morgan by telephone in California from his residence in Riverdale, Georgia. Later, the appellant offered Mr. Morgan unlimited telephone service for $300.00 a month.

As a result of this criminal activity, the government filed a criminal complaint against the appellant, and issued a search warrant for his residence at The Hometown Inn in Riverdale, Georgia. After his arrest, Mr. LaFraugh made a statement to the Secret Service in which he identified his source for the numbers, as well as the names of individuals to whom he had provided the numbers. According to Mr. LaFraugh, Stephen Hayes of Rome, New York, was at the top of the "multi-level pyramid;" however, he had also obtained numbers from both Hugh Leonard and Sue Tani of Long Beach, California, and from Tom Wynkoop of Pompano Beach, Florida.

Sprint officials later determined that the loss on only thirty-five of these numbers was $1,768,733.30. By the date of the sentencing hearing, they determined that the loss on forty-eight of the numbers was $2,012,483.85.

## PROCEEDINGS IN THE DISTRICT COURT

On August 9, 1988, a federal grand jury indicted the appellant for one count of wire fraud and one count of fraud in connection with access devices, both in violation of 18 U.S.C. §§ 1343 and 1029(a)(2).

On September 27, 1988, a federal grand jury filed a superseding indictment charging the appellant with one count of conspir-acy, one count of fraud in connection with access devices, two counts of mail fraud, and six counts of wire fraud, in violation of 18 U.S.C. §§ 371, 1029(a)(2), 1341 and 1343.

On December 6, 1988, a jury trial commenced before United States District Judge G. Ernest Tidwell. After the trial began, the defendant changed his plea from not guilty to guilty on counts two, six, nine and ten, which included the offenses of wire fraud, mail fraud, fraud in connection with access devices, and conspiracy.

The district court's presentence investigation report, in compliance with the Federal Sentencing Guidelines, computed Mr. LaFraugh's initial base offense level as 17, based on the amount of loss, resulting from not only his direct involvement, but from the acts of his co-conspirators as well. *See* Guidelines § 3B1.1(c). The report found Mr. LaFraugh's criminal history category to be III, which produced an applicable sentencing range of between 41 and 51 months.

Mr. LaFraugh objected to the report and argued that the loss calculations were speculative, particularly since it remained unclear what losses sustained by Sprint were attributable to his actions alone. Although Mr. LaFraugh conceded that a conspirator generally is liable for the acts of a co-conspirator, he argued that no conspiracy existed, or that several conspiracies existed and that he could only be tied to one of them for purposes of sentencing. Thus he contended that the district court wrongly attributed the $1.7 million in losses to him for sentencing purposes.

Mr. LaFraugh further objected to the report's finding that he was a manager or supervisor of the criminal scheme. He asserted that others in the scheme were more culpable than he, and that the mere act of supplying codes to someone should not justify a finding that he was a manager or supervisor.

Prior to sentencing, the district judge conducted a hearing to resolve these objections. Based on Mr. Vanucci's testimony, he found that Mr. LaFraugh's actions or those of his co-conspirators had caused

Sprint *to lose at least* $1.7 million. He adopted the report insofar as it set Mr. LaFraugh's base level offense at 20, but reduced the offense level to 18 to reflect his acceptance of responsibility for his actions. This reduction lowered the applicable sentencing range to 33–41 months. The judge sentenced Mr. LaFraugh to serve the maximum term, 41 months, to be followed by three years of supervised release.

## DISCUSSION

■ Mr. LaFraugh first contends that the sentencing judge incorrectly applied guideline § 2F1.1(b)(1)(J) to include *all* the losses which Sprint claimed to have sustained as a result of access code fraud. He asserts that he alone did not cause Sprint's $1.7 million loss, either directly or indirectly; he thus contends that the court should not have imputed all losses to him through his role in the admitted conspiracy. Specifically Mr. LaFraugh contends that the district court erred by using the Supreme Court's holding in *Pinkerton v. United States,* 328 U.S. 640, 646–647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) that "the overt act of the partner in crime is attributable to all," as guidance in the sentencing process, rather than as merely a means of establishing guilt.

■ We begin by examining the language of the pertinent sentencing guideline. At the time of Mr. LaFraugh's offense, it provided as follows:

*Relevant Conduct:*

To determine the seriousness of the offense conduct, all conduct, circumstances, and injuries relevant to the offense of conviction shall be taken into account.

(a) Unless otherwise specified under the guidelines, conduct and circumstances relevant to the offense of conviction

1. The United States Sentencing Commission amended guideline § 1B1.3 effective January 15, 1988. *See* Notice of Amendments to Sentencing Guidelines, 53 Fed.Reg. 1286, 1287 (1988). In so doing, the Commission noted that the purpose of the amendment was to clarify the guideline and that "[t]he amended language restates the intent of section 1B1.3 as originally promulgated." *Id.* at 1288.

[include] acts or omissions committed or aided and abetted by the defendant, *or by a person for whose conduct the defendant is legally accountable, that [are] part of the same course of conduct, or a common scheme or plan, as the offense of conviction....*

Sentencing Guidelines, § 1B1.3 (Oct. 1987).[1] (emphasis supplied). Thus, once a sentencing court determines that certain acts or omissions are "part of the same course of conduct" as the offense of conviction, it may hold the appellant responsible for all losses resulting from acts by participants for whose conduct the court deems him accountable, when applying the specific offense characteristic sections of the guideline's Chapter 2.

■ We hold that the standards embodied in section 1B1.3 roughly approximate those detailed by the Supreme Court in *Pinkerton.* We do not suggest, of course, that the guidelines in any sense codify the *Pinkerton* rule. We do hold, nevertheless, that the guideline's attribution to the defendant of "acts ... by a person for whose conduct the defendant is legally accountable, that ... are part of ... a common scheme or plan," resembles in essence the *Pinkerton* attribution to co-conspirators of "... the same or other acts in furtherance of the conspiracy ... for the purpose of holding them responsible for the substantive offense." *Pinkerton,* 328 U.S. at 647, 66 S.Ct. at 1184. Thus we hold that the district court correctly analyzed the factors relevant to Mr. LaFraugh's culpability.

Mr. LaFraugh next contends that, even if the *Pinkerton* doctrine was an appropriate point of reference for the district court, the court nevertheless incorrectly applied the ruling in his case. He contends, in short, that the court should not hold him responsible for the acts of co-conspirators when the evidence showed multiple conspiracies, rather than a single one.

The record here is unclear as to when Mr. LaFraugh committed the instant offense, but he apparently engaged in the activities both before and after January 15, 1988. We note that as applied to the facts of this case, there is no substantive difference between the October 1987 and January 1988 versions of guideline § 1B1.3.

The instant case, as noted, involved a network consisting of Mr. LaFraugh, his brother, and his girlfriend, all of whom would receive stolen access code numbers and would sell them to others. Mr. LaFraugh admitted his involvement after his arrest, and described his position as being in the middle of a "multi-level pyramid." A search of one of Mr. LaFraugh's customers produced over 250 stolen access numbers, most of which the customer attributed to Mr. LaFraugh.

Appellant now contends that, under the wheel analogy developed by the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the conspiracy in his case produced a hub, (Mr. LaFraugh), and various spokes, (the central actors), but no rim (i.e. shared knowledge and common purpose) encircling the spokes. Thus, he argues, the evidence showed only a series of multiple conspiracies, leaving him responsible only for losses resulting from those in which he actually participated. Appellees, on the other hand, contend that the conspiracy can best be likened to a single chain, with responsibility flowing to each participant.

We begin in utter sympathy with the sentiments expressed by our predecessor, the Fifth Circuit, over fifteen years ago:

> As for us, the problem is difficult enough without trying to compress it into figurative analogies. Conspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains, or any one or all of today's galaxy of mechanical, molecular or atomic forms.

*United States v. Perez*, 489 F.2d 51, 59 n. 11 (5th Cir.1973), *cert. den.*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). We, too, prefer to examine these facts without recourse to the tempting, but ultimately confining, appeal of extended metaphors. As the Fifth Circuit has noted, "if there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy." (citation omitted.) *Perez*, 489 F.2d at 62.

*That* logic, surely, is enough to guide us in our determination today.

Here, the appellant was involved in a business called "Service Amongst Friends Enterprises," whose purpose was to distribute long distance access code numbers to others, thereby generating his profit. The appellant himself identified the source of these numbers, as well as the names of others from whom he also obtained them. According to Mr. LaFraugh, Mr. Hayes was at the top of what the appellant called a "multi-level pyramid"; others involved in distribution included Mr. Leonard, Ms. Tani, and Mr. Wynkoop. Ms. Duntley explained that she received Mr. Wynkoop's name and number from the appellant; when she contacted him, he gave her some numbers and the telephone number of Mr. Hayes. Mr. Hayes himself later provided Ms. Duntley with numbers. The appellant distributed those numbers to his brother, his girlfriend, Ms. Duntley and Mr. Jack Campbell. With this scenario in mind, we do not hesitate to find a common purpose among the various defendants. As the Supreme Court has said:

> The scheme was in fact the same scheme; the [participants] knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of it all. By this separate agreements, if such they were, they became parties to the larger common plan, joined together by this knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.

*Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947). We hold, therefore, that the record amply supports the district court's finding that Mr. LaFraugh was a member of a single conspiracy which was responsible for Sprint's entire loss.

■ Mr. LaFraugh finally contends that there was insufficient evidence to support the district court's finding that he was a manager or supervisor of the access code

distribution ring. He specifically contends that he merely sold numbers to purchasers; a manager or supervisor, he contends, would have actual authority over other participants. However, in Mr. LaFraugh's case there is undisputed evidence that he illegally obtained a large number of access codes, sold them to others, offered assistance when people had trouble using them, and communicated with his brother, his girlfriend and others in the conspiracy at regular intervals. Under such circumstances, we perfectly comprehend the district court's assignment of managerial status to Mr. LaFraugh.

In *United States v. Vasquez*, 874 F.2d 250, 252 (5th Cir.1989), the Fifth Circuit held that the district court had properly raised the defendant's offense level pursuant to guideline 3B1.1 since the defendant "... recruited and directed a codefendant, was the main participant in negotiations with an undercover officer, and used his apartment as a base of operations." In the instant case, Mr. LaFraugh recruited and directed Ms. Duntley, was the main participant in negotiations with Special Agent Morgan, and used The Hometown Inn, where he resided, as his base of operations. Thus, the record fully justifies the district court's factual finding that Mr. LaFraugh was a manager or supervisor for the purposes of guideline § 3B1.1. Since this finding was not clearly erroneous, we reject Mr. LaFraugh's challenge to the adjustment.

### CONCLUSION

The district court properly analyzed the appellant's role in the conspiracy, and properly found him a member of a single conspiracy responsible for Sprint's entire loss. The record, moreover, supports the district court's attribution of supervisory or managerial status to Mr. LaFraugh.

The judgment of the district court is therefore

AFFIRMED.