UNITED STATES of America, Appellee,

v.

Hector GARCIA, Defendant, Appellant.

No. 91–1708.

United States Court of Appeals,
First Circuit.

Heard Dec. 3, 1991.

Decided Jan. 16, 1992.

---

Edward J. Romano, with whom Paul J. DiMaio, Providence, R.I., was on brief, for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., and Kenneth P. Madden, Asst. U.S. Atty., Providence, R.I., were on brief, for U.S.

Before SELYA, Circuit Judge,
BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

Defendant-appellant Hector Garcia pled guilty to multiple counts of distributing, and conspiring to distribute, cocaine. He was thereupon sentenced. In this appeal, Garcia contests his sentence on two grounds, both related to the district court's calculation of the guideline sentencing range (GSR), viz., (1) the court's inclusion of certain quantities of cocaine distributed by a coconspirator as relevant conduct; and (2) the court's refusal to characterize

Garcia's role in the offense more leniently or, alternatively, to hold an evidentiary hearing anent Garcia's role. Discerning no error, we affirm.

## I. BACKGROUND

Because appellant's conviction resulted from a guilty plea, we draw the facts from the Presentence Investigation Report (PSI Report) and the transcript of the sentencing hearing. *See United States v. Dietz*, 950 F.2d 50, 51 (1st Cir.1991).

The appellant was a part owner of the Sportsman's Bar in Central Falls, Rhode Island. On June 29, 1990, an undercover agent, Richard Vega, came to the bar.[1] Vega told Garcia that he was looking for a fresh source of cocaine, whereupon Garcia introduced him to Rafael Zuleta. Zuleta took Vega outside and sold him 55.38 grams of cocaine. When Vega inquired about the availability of a larger batch at a cheaper price, Zuleta said that he would discuss the possibility with Garcia.

On July 7, Vega asked Garcia to contact Zuleta about a price reduction. Shortly thereafter, Garcia was seen conferring with Zuleta. On July 10, Vega and Zuleta forgathered at the bar. They proceeded to a private residence in Central Falls. Once there, Zuleta said that his "boss" had agreed to lower the price; in turn, Vega purchased 125.72 grams of cocaine. Discovering, later, that he had inadvertently shortchanged his purveyor, Vega repaired to the Sportsman's Bar. He gave Garcia $1000 (the full amount of the underpayment), and explained the situation. Zuleta subsequently acknowledged that he had received the funds. On August 2, Vega again arranged a visit to the bar. Garcia greeted him, indicating an awareness that a rendezvous with Zuleta was in the offing. When Zuleta arrived, he and Vega journeyed to the same private residence where, this time, Vega bought 127.4 grams of cocaine.

In due course, three more transactions occurred. On August 28 and September 26, Vega and Elvin Laboy, a federal agent posing as Vega's brother-in-law, purchased a total of 629.1 grams of cocaine from Zuleta. On November 28, Zuleta delivered an additional 123.9 grams to Laboy. None of these transactions originated at the Sportsman's Bar or involved Garcia in any overt manner.

Zuleta and Garcia were soon indicted by a federal grand jury. The first count of the indictment charged them with conspiracy to distribute cocaine "from a time unknown up to and including on or about November 28, 1990," in violation of 21 U.S.C. § 846. The remaining six counts charged drug distribution in violation of 21 U.S.C. § 841(a)(1). Counts 2, 3, and 4 charged both defendants with complicity in the June 29, July 10, and August 2 deliveries. Counts 5, 6, and 7 charged Zuleta (but not Garcia) with perpetrating the August 28, September 26, and November 28 deliveries.

After some preliminary skirmishing, Garcia agreed to plead guilty to the four counts in which he was named. A written plea agreement (the Agreement) was executed in pursuance of Fed.R.Crim.P. 11(e)(1)(B) (covering plea agreements in which the prosecution agrees, *inter alia*, to make a sentencing recommendation "with the understanding that such recommendation ... shall not be binding upon the court"). As part of the Agreement, the government pledged that it would seek to amend the indictment to reflect that, insofar as Garcia was concerned, the charged conspiracy ended "on or about August 2, 1990." The government further agreed to "recommend the minimum sentence under the appropriate guideline range." The Agreement did not represent the effect, if any, that amending the indictment might have on the GSR, nor did it hint what GSR would be applicable to the grouped counts of conviction. The Agreement warned that the district court could freely ignore the government's sentencing recommendation.

At an ensuing Rule 11 hearing, the court below permitted the change of plea and granted the government's motion to amend

---

1. All dates are in 1990 unless otherwise specified.

the indictment. On July 12, 1991, sentence was imposed. This appeal followed.

## II. RELEVANT CONDUCT—DRUG QUANTITY

The principal challenge to the sentence involves the district court's quantification of the appellant's relevant conduct, expressed in grams of cocaine. Garcia argues that, because the district court's computation of the GSR rested upon its unsupportable finding that his criminal activity involved 1061.5 grams of cocaine—a finding that produced a base offense level of 26, *see* U.S.S.G. 2D1.1(c)(9) (Drug Quantity Table)—the sentence was awry.[2] We are unconvinced.

### A.

■ In a drug distribution case to which the guidelines apply, "a key datum in constructing defendant's sentence is the quantity of narcotics attributable to him for sentencing purposes, a datum bounded by the sum of the charged conduct to which the defendant pleads plus his 'relevant' uncharged conduct." *United States v. Bradley*, 917 F.2d 601, 604 (1st Cir.1990); *see also United States v. Blanco*, 888 F.2d 907, 908–11 (1st Cir.1989) (explicating operation of principle). The drug quantity is to be derived from all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see generally United States v. Sklar*, 920 F.2d 107, 110 (1st Cir.1990); *Blanco*, 888 F.2d at 910.

This court has repeatedly upheld the inclusion as relevant conduct of acts either not charged or charged but dropped. *See, e.g., United States v. Estrada–Molina*, 931 F.2d 964, 965 (1st Cir.1991); *United States v. Mak*, 926 F.2d 112, 113 (1st Cir.1991); *Sklar*, 920 F.2d at 111–12; *United States v. Mocciola*, 891 F.2d 13, 16 (1st Cir.1989); *Blanco*, 888 F.2d at 909–11. In the context of a conspiracy, the proper inquiry in determining whether such additional acts should be included as relevant conduct is whether

those acts were reasonably foreseeable by the defendant and committed in furtherance of the conspiracy. *See United States v. Edwards*, 945 F.2d 1387, 1392 (7th Cir. 1991) (use of standard conspiracy principles is consistent with application of relevant conduct provisions of sentencing guidelines); *United States v. LaFraugh*, 893 F.2d 314, 317 (11th Cir.) (similar), *cert. denied*, — U.S. —, 110 S.Ct. 2601, 110 L.Ed.2d 281 (1990); *see also Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946) (a defendant is responsible for coconspirator's acts that are reasonably foreseeable and committed in furtherance of the conspiracy).

### B.

Here, then, the district court was plainly entitled to begin its compilation of relevant conduct by aggregating the quantities of cocaine involved in the counts of conviction: 308.5 grams, spread over three transactions (June 29, July 10, and August 2). The court went on to add, under the rubric of relevant uncharged conduct, the 753 grams of cocaine sold by Zuleta in the course of the next three transactions (August 28, September 26, and November 28). In doing so, the court referred initially to a guideline provision instructing the sentencing court to examine

all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.

U.S.S.G. § 1B1.3(a)(1). An application note to this guideline states: "In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also

---

**2.** After a downward adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, the court fixed the GSR at 51–63 months, *see* U.S.S.G. Ch.

5, Pt. A (Sentencing Table) (net offense level 24, criminal history category I), and sentenced Garcia to fifty-seven months in prison.

includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. (n. 1); *see also id.*, comment. (backg'd) ("in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction"). Following these signposts, the district court found that the three sales postdating August 2 arose out of the joint undertaking upon which Zuleta and Garcia had earlier embarked; and that the sales, though unassisted by Garcia, were reasonably foreseeable by him, all things considered. On this premise, the court held Garcia accountable for the incremental quantities.

### C.

■ The appellant objects to inclusion of the 753 grams. We approach the objection mindful that, on appeal, a sentencing court's determination that drug transactions did, or did not, form part of the same course of conduct as the counts of conviction is a predominantly factual finding that will be disturbed only if clearly erroneous. *See Sklar,* 920 F.2d at 110; *Bradley,* 917 F.2d at 605.

In advancing his position, Garcia relies heavily upon *United States v. Wood,* 924 F.2d 399 (1st Cir.1991). In *Wood,* we ruled that an uncharged drug transaction between the defendant's wife and a drug supplier, of which defendant had no knowledge, could not properly be counted as relevant conduct for purposes of constructing Wood's GSR. *Id.* at 404–05. In that case, however, the defendant in no way conspired to facilitate the deal; indeed, he had no knowledge that his wife was engaged in drug transactions with anyone other than himself. *Id.*

The instant case is at a considerable remove. Where the guidelines hold sway, the measure of a defendant's accountability for drug transactions in which he was not personally involved is usually congruent

with the scope of his agreement with the other participants in the criminal enterprise. *See Edwards,* 945 F.2d at 1392. Here, unlike in *Wood,* the range and reach of Garcia's agreement with his coconspirator, Zuleta, could reasonably be said to transcend the initial series of transactions. It is unarguable that, between June 29 and August 2, Garcia and Zuleta were partners in a conspiracy catering to Vega's cocaine requirements. It is more debatable, to be sure, whether the final three transactions—handled by Zuleta out of appellant's presence and without any byplay at the Sportsman's Bar—should be included as relevant conduct. On balance, however, we think the proof was adequate to warrant their inclusion.

Garcia introduced Vega to Zuleta for the express purpose of facilitating drug transactions. He was aware of the nature and salient details of the relationship that developed between the two men. There was no evidence of Garcia's affirmative withdrawal from the conspiracy or of any other intervening event materially affecting the trafficking calculus. When the Sportsman's Bar was searched on November 30, 1990, the office safe contained cocaine. Looking at the totality of the circumstances, we believe the court below was justified in viewing the later series of sales as the natural progression of the earlier series of sales—and in determining that Garcia, having orchestrated the connection and set the price, had every reason to assume that sales of cocaine to Vega (or those in privity with him) would continue beyond August 2, 1990. *See, e.g., United States v. Williams,* 897 F.2d 1034, 1041 (10th Cir.1990) (in calculating GSR, district court appropriately included drugs not personally handled by defendant; defendant had knowledge of the ongoing criminal enterprise "and took no effective steps to bring it to an end"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991); *United States v. Vinson,* 886 F.2d 740, 742 (4th Cir.1989) (district court appropriately included drug quantities from transactions occurring during eight-month period following last episode in which defendant actively participated; given the

progress of the distribution network over time, it was "reasonably foreseeable" that the conspiracy "would continue unabated"), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990). In other words, the sentencing court had a plausible basis for concluding that Garcia's commitment to the venture, and the scope of his conspiratorial agreement, encompassed the final series of transactions.

We have said enough on this score. Given the facts of record, the inferences reasonably extractable therefrom, and the deferential standard of review, we cannot set aside as clearly erroneous the sentencing court's conclusion that the last three sales of cocaine were in furtherance of the original conspiracy and reasonably foreseeable by Garcia. *See United States v. Ruiz,* 905 F.2d 499, 508 (1st Cir.1990) ("where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous"); *United States v. Jimenez–Otero,* 898 F.2d 813, 814–15 (1st Cir. 1990) (same). The court below was, therefore, entitled to include as "relevant conduct" the total amount of cocaine sold in the course of all six transactions when determining the GSR.

### D.

■ The appellant makes one final point about the district court's aggregation of drug quantities. He maintains, albeit with greater vigor than intellection, that the court's reference to the final three transactions in some way violated the Agreement. His contention is unavailing.

It may well be that Garcia's root purpose in asking the government, as part of the Agreement, to amend the indictment— thereby shortening the life span of the charged conspiracy on paper—was an attempt to skirt responsibility for the large-scale drug transactions that occurred during the period from August 28 through

November 28. But, the attempt was poorly executed. Interpreting plea agreements is an art informed by contract-law principles. *See United States v. Hogan,* 862 F.2d 386, 388 (1st Cir.1988); *United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985). Thus, a defendant's subjective expectations as to how a plea agreement will redound to his benefit are enforceable, if at all, only to the extent that they are objectively reasonable. *Hogan,* 862 F.2d at 388; *United States v. Arnett,* 628 F.2d 1162, 1164 (9th Cir.1979).

Here, any expectancy that sentence would be imposed without reference to the last three sales was objectively unreasonable. For one thing, as the appellant concedes, the Agreement itself contained no such proviso—and the appellant acknowledged to the district court, during the change-of-plea hearing, that nothing had been omitted which Garcia thought was "part of the [plea] agreement."[3] For another thing, the Agreement itself recited that no "promises or inducements," other than those expressed, had been made—and the appellant reiterated as much at the hearing. Lastly, the district court took pains to ensure that the appellant knew (1) that the court was not required to accommodate the government's sentencing recommendations, but would "make[ ] a decision independently" as to the proper sentence; (2) that the contours of the GSR were completely up in the air pending the court's study of the case "after receiving the pre-sentence report"; and (3) that, consequently, a twenty-year prison sentence on each of the four counts of conviction was possible. In response, the appellant stated (not without some apparent hyperbole), "I understand that everything is up to the Judge."

We will not paint the lily. Given the letter of the Agreement, the district court's workmanlike Rule 11 inquiry, the appel-

---

**3.** If the Agreement were deficient for failure to spell out a promise that the narcotics involved in the later transactions would not count against the appellant at sentencing, the change-of-plea hearing was when an objection should have been raised. *See, e.g., Hogan,* 862 F.2d at

389 n. 4; *United States v. Crisp,* 817 F.2d 256, 259 (4th Cir.), *cert. denied,* 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987). Any such stipulation would, of course, have required the sentencing court's acquiescence. *See generally* Fed.R.Crim.P. 11(e)(1)(C), 11(e)(3).

lant's contemporaneous disclaimer of any special (unexpressed) arrangements, and the utter absence of any sign that the prosecution intended to snooker the appellant into offering a guilty plea, we see no unfairness in the district court's consideration of the 753 grams of cocaine sold by Zuleta away from the Sportsman's Bar when calculating Garcia's GSR.[4] *Cf., e.g., Mak,* 926 F.2d at 113 (observing that "a drug case defendant, seeking to benefit from a plea agreement with the Government, would normally have to obtain an agreement about sentence length, not an agreement to drop related counts") (dictum; citations omitted); *United States v. La Guardia,* 902 F.2d 1010, 1016 (1st Cir. 1990) (finding no cognizable unfairness in government's failure to move at sentencing for a downward departure, based on defendant's substantial assistance, when plea agreement did not commit government to doing so).

## III. ROLE IN THE OFFENSE

Garcia's second assignment of error has two aspects, both relating to the district court's refusal, in constructing the GSR, to treat him as a "minimal" or "minor" participant in the criminal activity.[5]

### A.

■ Absent mistake of law, we review a sentencing court's role-in-the-offense determination only for clear error. *See Dietz,* 950 F.2d at 52; *United States v. Akitoye,* 923 F.2d 221, 227 (1st Cir.1991). We have often held, and today reaffirm, that such determinations, if based on rea-

sonable inferences drawn from undisputed facts, cannot be clearly erroneous. *See, e.g., United States v. DiIorio,* 948 F.2d 1, 5 (1st Cir.1991); *United States v. Rosado-Sierra,* 938 F.2d 1, 1–2 (1st Cir.1991) (per curiam); *United States v. Ocasio,* 914 F.2d 330, 333 (1st Cir.1990); *Ruiz,* 905 F.2d at 508. Moreover, when a defendant seeks to show that his role was so tangential as to justify a downward adjustment in an otherwise-applicable offense level, he must carry the devoir of persuasion. *See Rosado-Sierra,* 938 F.2d at 1; *Ocasio,* 914 F.2d at 332. These principles are dispositive here.

■ At the sentencing hearing, appellant's counsel stated that Garcia had no objection to the facts as set forth in the PSI Report. From those facts, *see supra* pp. 2–3, the court was surely at liberty to infer that Garcia, far from being a minimal or minor player, was a full partner in the counts of conviction. Objectively speaking, there was little basis for suggesting that Garcia was substantially less culpable than the minerun of cocaine traffickers. Accordingly, the district court's conclusion—that Garcia's role outstripped the "minimal" and "minor" rungs on the hierarchical ladder of blameworthiness—was fully supportable. *See, e.g., Rosado-Sierra,* 938 F.2d at 2; *United States v. Osorio,* 929 F.2d 753, 764 (1st Cir.1991); *see generally Ocasio,* 914 F.2d at 333 (discussing approach to downward role-in-the-offense adjustments). In the last analysis, inferences reasonably drawn from discernible facts by the sentencing judge are inexpugnable because they "are uniquely within [the

---

4. Although we discern no error here, we are aware of a potential for unfairness. In a case like this one, where uncharged conduct, if relevant, can dramatically affect the offense level, we think it would be advisable, though not required, for the district court, in the interest of avoiding any possible misunderstanding, to point out specifically that merely amending the indictment to abbreviate the term of the alleged conspiracy would not preclude the court's consideration of subsequent transactions in calculating the GSR. Such a warning would be especially apt in circumstances where, as here, the defendant's motive for seeking to amend the indictment seems patent.

5. U.S.S.G. § 3B1.2 provides for a four-level reduction in the offense level if the defendant is a "minimal" participant in the criminal activity, a two-level reduction if the defendant is a "minor" participant, or a three-level reduction if the defendant's participation falls somewhere in between. The application notes give as an example of a minimal participant in a drug scheme someone who "was recruited as a courier for a single smuggling transaction involving a small amount of drugs." *Id.,* comment. (n.2). A minor participant is described as one "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.,* comment. (n.3).

judge's] province." *Bradley*, 917 F.2d at 605.

### B.

The remaining arrow from appellant's quiver is equally misdirected. Garcia asseverates that, at a bare minimum, the district court should have accorded him an evidentiary hearing on the role-in-the-offense issue. We disagree.

■ It may sometimes be necessary to convene an evidentiary hearing when facts important to sentencing are genuinely in dispute. *See* U.S.S.G. § 6A1.3(a), p.s.; *id.*, comment. It must be recognized, however, that the trier has some leeway in this regard. When the district court declines to hold an evidentiary hearing in the sentencing milieu, the court of appeals will review the denial only for abuse of discretion. *See United States v. Gerante*, 891 F.2d 364, 367 (1st Cir.1989); *United States v. Monaco*, 852 F.2d 1143, 1148 (9th Cir.1988), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989). A criminal defendant, after all, is not entitled to an evidentiary hearing upon demand. *See, e.g., United States v. Romolo*, 937 F.2d 20, 25 (1st Cir.1991); *United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir.1990); *see also United States v. DeCologero*, 821 F.2d 39, 44 (1st Cir.1987) ("hearings cannot be convened at the whim of a suitor, made available like popsicles in July, just because a passerby would like to have one").

■ In the case at hand, the shortcomings of appellant's demand for an evidentiary hearing can be captured by reiterating the epigraph "too little, too late." When the PSI Report was promulgated, and again when the sentencing hearing began, the appellant eschewed any objection to the facts upon which the sentencing judge's conclusions were to be based. By couching his objections to the PSI Report exclusively as interpretations of the facts, not as challenges to the underlying facts themselves, the appellant effectively obviated any need for an evidentiary hearing. Additionally, because the appellant waited until the objections to the PSI Report had been resolved and the imposition of sentence was

underway before suggesting that evidence be taken, his request was, as the lower court observed, untimely. Either reason— the lack of utility in holding a hearing or the dilatoriness of the hearing request— would sturdily support the district court's ruling. Taken together, the two reasons demonstrate irrefutably that the court did not misuse its discretion in denying an evidentiary hearing.

*Affirmed.*