November 3, 1995 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1094

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS RAUL RIVERA-GOMEZ,

Defendant, Appellant.



ERRATA SHEET ERRATA SHEET

The opinion of this court issued on October 12, 1995, is
corrected as follows:

On page 7, line 20, change "is only admissible" to "may be
excluded"

UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1094

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS RAUL RIVERA-GOMEZ,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge] 



Before

Selya and Stahl, Circuit Judges, 

and Gorton,* District Judge. 



Carlos A. Vazquez-Alvarez, Assistant Federal Public 
Defender, with whom Benicio Sanchez Rivera, Federal Public 
Defender, was on brief, for appellant.
Jose A. Quiles-Espinosa, Senior Litigation Counsel, with 
whom Guillermo Gil, United States Attorney, and Edwin O. Vazquez, 
Assistant United States Attorney, were on brief, for the United
States.



October 12, 1995




*Of the District of Massachusetts, sitting by designation.

SELYA, Circuit Judge. A jury convicted defendant- SELYA, Circuit Judge. 

appellant Luis Raul Rivera-Gomez on three counts of carjacking,

18 U.S.C. 2119, and three counts of aiding and abetting the use

and carriage of firearms during and in relation to a crime of

violence, 18 U.S.C. 2(a), 924(c). In terms of prison time,

the trial judge imposed concurrent 180-month incarcerative

sentences for the first two carjacking counts, a sentence of life

imprisonment for the third carjacking, and concurrent sentences

of five years, to run consecutively to the other sentences, for

the firearms counts. This appeal challenges an evidentiary

ruling, a case management ruling, and the constitutionality of

the life sentence.

I. BACKGROUND I. BACKGROUND

The evidence adduced at trial involved three separate

carjacking incidents. We sketch the facts as the jury

warrantably could have found them, resolving all evidentiary

conflicts in the government's favor and adopting all reasonable

inferences therefrom that support the verdict.

The first carjacking occurred on December 3, 1993. The

victim, Cesar Correa Rivera (Correa), had driven a friend home.

While they were parked outside her abode, a vehicle nudged

Correa's car. Not knowing the vehicle or trusting its occupants,

Correa tried to flee. After a brief chase, the rogue vehicle

blocked Correa's path and two armed men alighted. One of the

men, later identified as Jose Roman Hernandez (Roman), struck

Correa on the head twice with his revolver and ordered him to

3

relinquish his valuables. Meanwhile, the second man, later

identified as Rivera-Gomez, threatened Correa's companion with a

gun. Appellant eventually ordered the victims to kneel and stare

at the ground. Roman then departed in the carjackers' original

vehicle, leaving appellant to drive Correa's automobile.

Four days later, the same two marauders assaulted an

elderly retired couple, Rufino Garcia Maldonado (Garcia) and his

wife, Clara. The assault occurred when Clara left the couple's

car to open the gate leading into their driveway. One man

threatened her with a weapon and forced her to the ground, while

the second man pointed a gun at Garcia's head, ordered him out of

the car (a red Suzuki), and relieved him of his wallet. The

robber then struck Garcia on the head, and he and his comrade

drove off in the Suzuki.

A short time later, the Garcias' Suzuki, with appellant

at the wheel, pulled alongside a Mazda RX-7 operated by Reynaldo

Luciano Rivera (Luciano). Roman, then a passenger in the Suzuki,

pointed a gun at Luciano and ordered him to freeze. Instead of

submitting to this minatory demand, Luciano stepped on the

accelerator. At the same time, his companion, Dalia Hidalgo

Garcia (Hidalgo), leapt to the ground. The predators fired in

the direction of the escaping car, and, when it stopped, Roman

shot Luciano in the head at point-blank range. Apparently

realizing that they had killed the young man, Roman and Rivera-

Gomez fled the scene without expropriating the Mazda.

Soon thereafter, a homicide detective spotted a red

4

Suzuki in the vicinity and, having received a report of the

latest incident, circled to pursue it. After a Hollywood-style

chase involving several police vehicles, the Suzuki crashed.

Appellant exited through the driver's door, and Roman exited from

the passenger's side. The authorities quickly apprehended them.

On January 5, 1994, a federal grand jury charged the

two men with three counts of carjacking and three counts of

aiding and abetting each other in the use of firearms during and

in relation to crimes of violence. Count 3 of the indictment

featured an allegation concerning Luciano's death. Though Roman

entered a plea, appellant maintained his innocence. Following a

three-day trial, a jury found appellant guilty on all six counts.

This appeal ensued.

II. DISCUSSION II. DISCUSSION

Appellant advances three assignments of error. First,

he maintains that the district court erred in admitting evidence

of Luciano's death. Second, he argues that the court should have

declared a mistrial when a prosecution witness stated in the

jury's presence that Roman had pleaded guilty. Finally, he

suggests that his life sentence punishes him for an offense with

which he was never charged (Luciano's murder), and, thus,

transgresses the Constitution. We address these reputed errors

sequentially.

A. Admission of Evidence of Victim's Death. A. Admission of Evidence of Victim's Death. 

Appellant, who unsuccessfully moved in limine to 

forestall the prosecution from showing that Luciano was killed in

5

the course of the third incident, asseverates that the victim's

death was irrelevant to the question of guilt on the charge of

attempted carjacking, and that no evidence concerning the death

should have been admitted. Our study of this asseveration begins

with the language of the carjacking statute, which provided on

the date of appellant's offense:

Whoever, possessing a firearm . . .
takes a motor vehicle that has been
transported, shipped, or received in
interstate or foreign commerce from the
person or presence of another by force and
violence or by intimidation, or attempts to
do so, shall -
(1) be fined under this title or
imprisoned not more than 15 years, or both,
(2) if serious bodily injury . . .
results, be fined under this title or
imprisoned not more than 25 years, or both,
and
(3) if death results, be fined
under this title or imprisoned for any number
of years up to life, or both.

18 U.S.C. 2119 (Supp. V 1993).

Appellant asserts that the district court mistakenly

thought that the victim's death constituted an element of the

offense, and allowed the evidence on that basis. This was error,

he maintains, because subsection (3), the "death results"

provision, is not an element of the offense, but, rather, is

simply a sentencing enhancement mechanism. Thus, he concludes,

the victim's death had no bearing upon the determination of guilt

for the underlying offense, and should not have been brought to

the jury's attention.

As an inauguratory matter, we disavow appellant's

assertion that the district court held the "death results"

6

provision to be a separate element of the offense of carjacking.

As we parse the version of the statute under which Rivera-Gomez

was convicted, the crime of carjacking had four elements, viz., 

(1) taking (or attempting to take) from the person or presence of

another, (2) by force, violence, or intimidation, (3) a motor

vehicle previously transported, shipped, or received in

interstate or foreign commerce, (4) while using or carrying a

firearm.1 See United States v. Johnson, 32 F.3d 82, 85 (4th 

Cir.), cert. denied, 115 S. Ct. 650 (1994); United States v. 

Harris, 25 F.3d 1275, 1279 (5th Cir.) cert. denied, 115 S. Ct. 

458 (1994); United States v. Singleton, 16 F.3d 1419, 1422 (5th 

Cir. 1994).

The district court appears to have understood this

structure, and the record suggests that the court did not

consider the death of a victim to be a further (independent)

element of the carjacking offense. Judge Laffitte stated at the

pretrial hearing on the motion in limine that the death of the 

victim was an offense element "not as such," but only as "part

and parcel" of the "force and violence" element of the carjacking

charge. In the same vein, the judge's jury instructions outlined

 

1Section 2119 has since been amended. In the 1994 crime
bill, Congress substituted the phrase "with the intent to cause
death or serious bodily harm" for the language requiring
possession of a firearm. See Violent Crime Control and Law 
Enforcement Act of 1994, 60003(a)(14), Pub. L. No. 103-322, 108
Stat. 1796, 1970. Thus, the new law leaves the offense with four
elements, but changes the focus of the fourth element from
weaponry to intention, requiring that the prosecution prove that
the defendant perpetrated the crime with the specific intent of
causing death or serious bodily harm.

7

the four essential elements of carjacking described above, saying

nothing about "death results" as an independent element

applicable to count 3.

In our view, then, the court's admission of the

evidence derived not from a misapprehension that the death

constituted an independent offense element, but, rather, from a

belief that evidence of Luciano's death helped to prove the

essential "force and violence" element. The question that

remains is whether the court blundered in allowing the government

to present the challenged evidence as a means of proving that the

carjackers employed force and violence in carrying out the third

incident. We think not.

It is difficult to conceive of a situation in which the

death of a victim will not be relevant to the use of force and

violence during the commission of an attempted carjacking. See 

Fed. R. Evid. 401 (defining "relevant evidence"); United States 

v. Rodriguez, 871 F. Supp. 545, 549 (D.P.R. 1994) (approving 

admission of evidence of "the victim's death as well as the

manner and means by which it was accomplished" as relevant and

"highly persuasive" of "force and violence" in a carjacking

prosecution). This case is certainly not the exception that

proves the rule. Nevertheless, relevancy does not tell the total

tale. Evidence, though relevant, may be excluded "if its

probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the

jury." Fed. R. Evid. 403. We turn, therefore, to the balance of

8

probative worth and unfair prejudice.

In this instance, appellant insists that, even if

evidence concerning the killing was probative of guilt under the

force and violence element of the offense, it was not actually

necessary to the prosecution's case the government had other

evidence, such as the circumstances of the carjackers' initial

encounter with the victim, that would have made the point and

the likelihood was great that grisly details would stir the baser

passions of the jurors and cloud their minds so that they could

not make an objective appraisal of the evidence before them.

Thus, appellant's thesis runs, the risk of unfair prejudice

inherent in permitting the prosection to introduce evidence of

the homicide substantially outweighed whatever incremental

probative value the evidence may have supplied.

We review a trial court's rulings admitting or

excluding particular evidence for abuse of discretion. See 

United States v. Holmquist, 36 F.3d 154, 163 (1st Cir. 1994), 

cert. denied, 115 S. Ct. 1797 (1995); Veranda Beach Club Ltd. 

Partnership v. Western Surety Co., 936 F.2d 1364, 1373 (1st Cir. 

1991); United States v. Nazarro, 889 F.2d 1158, 1168 (1st Cir. 

1989). We grant the trial court especially wide latitude when

Rule 403 balancing is the subject of review. "Only rarely and

in extraordinarily compelling circumstances will we, from the

vista of a cold appellate record, reverse a district court's on-

the-spot judgment concerning the relative weighing of probative

value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 

9

1331, 1340 (1st Cir. 1988). This deference is equally due in

criminal cases. See, e.g., United States v. Rodriguez-Estrada, 

877 F.2d 153, 156 (1st Cir. 1989); United States v. Ingraham, 832 

F.2d 229, 233-34 (1st Cir. 1987), cert. denied, 486 U.S. 1009 

(1988); United States v. Tierney, 760 F.2d 382, 388 (1st Cir.), 

cert. denied, 474 U.S. 843 (1985). 

Through this modest lens, we see no cognizable defect

in the district court's Rule 403 balancing. Whatever other

evidence was available, evidence of Luciano's death remained

highly probative of culpability for an essential element of a

section 2119 offense. Presumably, like most evidence offered by

the government in a criminal case, this evidence was designed to

prejudice the jury against the defendant in the sense that

exposure to it would render a conviction more likely. But the

introduction of relevant evidence to influence perceptions is the

stuff of our adversary system of justice. The law protects a

defendant against unfair prejudice, not against all prejudice. 

See Rodriguez-Estrada, 877 F.2d at 155-56; Onujiogu v. United 

States, 817 F.2d 3, 6 (1st Cir. 1987); see also Veranda Beach, 

936 F.2d at 1372 (explaining that "trials were never meant to be

antiseptic affairs; it is only unfair prejudice, not prejudice

per se, against which Rule 403 guards"). Since the evidence at

issue is so tightly linked to guilt as defined by the elements of

the offense, it would be surpassingly difficult to justify a

finding of unfair prejudice stemming from its introduction.

Here, moreover, there are several additional weights on

10

the scale favoring admissibility. For one thing, because the

perpetrators fled immediately after the shooting, leaving behind

both the Mazda and a dying man in the driver's seat, the

government's case on count 3 depended on its ability to prove

attempted carjacking. Without knowing of Luciano's death, the

jury may have been left to wonder why two supposed carjackers had

turned their backs on an expensive, late-model sports car. For

another thing, Hidalgo, understandably concerned with her own

safety at the time the incident occurred, could give only limited

testimony as to what transpired, and there was a definite risk

that the jury, if uninformed of Luciano's passing, would engage

in speculation as to why the prosecution did not offer his

testimony at trial. See, e.g., United States v. Accetturo, 966 

F.2d 631, 637 (11th Cir. 1992) (holding the fact of a witness's

death admissible as "relevant to explain the fact that [the

witness] did not testify" and to prevent the jury from

speculating), cert. denied, 113 S. Ct. 1053 (1993); see also 

United States v. Williams, 51 F.3d 1004, 1010 (11th Cir. 1995) 

(citing Accetturo in admitting evidence of a victim's death in a 

carjacking prosecution), petition for cert. filed (U.S. Aug. 11, 

1995) (No. 95-5555).

These considerations, taken in the aggregate,

underscore the invulnerability of the district court's ruling.

The evidence here did more than tend to show guilt on one element

of the offense; it also constituted a crucial chapter in the

government's narrative account of appellant's carjackings,

11

allowing the jury to put matters into perspective. Trial

evidence is supposed to help the jury reconstruct earlier events

and then apportion guilt or responsibility as the law may

require. Rule 403 exists to facilitate this process, not to

impede it. We think it follows that, although a "controlled

environment for the reception of proof is essential, . . . an

artificially sterile environment is neither necessary nor

desirable." Wagenmann v. Adams, 829 F.2d 196, 217 (1st Cir. 

1987); see also United States v. McRae, 593 F.2d 700, 707 (5th 

Cir.) ("Unless trials are to be conducted on scenarios, on unreal

facts tailored and sanitized for the occasion, the application of

Rule 403 must be cautious and sparing. Its major function is

limited to excluding matter of scant or cumulative probative

force, dragged in by the heels for the sake of its prejudicial

effect."), cert. denied, 444 U.S. 862 (1979). 

When a trial court in a criminal case exercises

discretion at first hand, the court of appeals should go very

slowly in interfering with its judgment calls. The need for

caution is magnified when, as now, a challenged ruling has the

effect of vindicating the government's well-established "right to

present to the jury a picture of the events relied upon . . .

including proof of all elements of the crime for which the

defendant has been brought to trial." United States v. Tavares, 

21 F.3d 1, 3-4 (1st Cir. 1994) (en banc) (citation and internal

quotation marks omitted). Here, the disputed evidence is both

picture and proof; though lurid, it is part of what old-fashioned

12

lawyers might call the res gestae, and it is directly probative 

of an element of the offense. Consequently, the court did not

err in admitting it. After all, it is the rare case in which a

court must require that the story of the crime be spoon-fed to

jurors in bits and pieces from which every drop of juice has been

drained.

B. Denial of Mistrial Motion. B. Denial of Mistrial Motion. 

During his trial testimony, a prosecution witness,

homicide detective Lama-Canino, blurted out that Roman

(appellant's partner in crime) had entered a guilty plea. Judge

Laffitte immediately struck the statement, instructed the jurors

to disregard it, and warned them not to ponder the codefendant's

fate. However, the court refused to declare a mistrial.

Appellant assigns error.

The trial judge is best situated to make a battlefield

assessment of the impact that a particular piece of improper

information may have on a jury. See United States v. Lau, 828 

F.2d 871, 874 (1st Cir. 1987), cert. denied, 485 U.S. 1005 

(1988). For this reason, we have long recognized that motions

for mistrial are committed to the presider's discretion, see, 

e.g., United States v. De Jongh, 937 F.2d 1, 3 (1st Cir. 1991), 

especially when such a motion is predicated on some spontaneous

trial development that can best be gauged in the ebb and flow of

the trial itself, see United States v. Pierro, 32 F.3d 611, 617 

(1st Cir. 1994), cert. denied, 115 S. Ct. 919 (1995). Our 

reluctance to intervene is often reinforced by an awareness that

13

in most cases a firm, timely curative instruction will adequately

quell the potential for prejudice. See United States v. 

Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993), cert. denied, 114 

S. Ct. 2714 (1994); United States v. Ferreira, 821 F.2d 1, 5-6 

(1st Cir. 1987).

Although every trial is different, and, therefore,

every mistrial motion is sui generis, the assignment of error in 

this case is reminiscent of that advanced in United States v. 

Bello-Perez, 977 F.2d 664 (1st Cir. 1992). There, the 

defendant's paramour twice blurted out that the defendant had

suffered a gunshot wound in an event unrelated to the drug

trafficking conspiracy with which he was charged. See id. at 

672. The district judge gave a contemporaneous curative

instruction on each occasion, and refused to declare a mistrial.

We upheld the ruling. See id. 

Here, as in Bello-Perez, the trial court's handling of 

the witness's rash comment was well within the broad range of its

discretion. The analogy operates on at least three levels.2

First, here, as in Bello-Perez, the offensive information, though 

unfit for jury consumption, was not of a kind that might be

 

2Appellant belatedly attempts to distinguish the two cases
on the ground that here, unlike in Bello-Perez, 977 F.2d at 672, 
the offending witness a police officer acted in bad faith by
deliberately uttering the improper testimony. At the time,
however, appellant's counsel expressed his agreement with the
judge's assessment that the witness had made a spontaneous,
accidental slip of the tongue. That ends the matter. Arguments
not raised in the lower court cannot be unfurled for the first
time on appeal. See United States v. Slade, 980 F.2d 27, 30 (1st 
Cir. 1992).

14

thought irredeemably to poison the well. The fact that Roman

pleaded guilty had no bearing upon appellant's primary line of

defense mistaken identity and had nothing to do with the

government's attempt to prove that Rivera-Gomez was the man who

accompanied Roman during the carjacking spree.

Second, the strength of the government's overall case

is frequently a cardinal factor in evaluating the denial of a

mistrial motion. Here, as in Bello-Perez, the prosecution's case 

was extremely robust. There is a correspondingly small risk,

therefore, that Lama-Canino's wayward remark could have been the

straw that broke the dromedary's back. See United States v. 

Scelzo, 810 F.2d 2, 5 (1st Cir. 1987). 

Third, permitting the trial to proceed is more

palatable because, as in Bello-Perez, the judge gave an immediate 

curative instruction a device that we have regularly endorsed

as a means of dispelling potential prejudice. See United States 

v. Chamorro, 687 F.2d 1, 6 (1st Cir.), cert. denied, 459 U.S. 

1043 (1982). We not only believe that the language used by the

court fit the occasion, but we also take heed that appellant did

not then or now suggest a more felicitous phrasing. At the

expense of carting coal to Newcastle, we note, too, that the

judge, in a commendable abundance of caution, again admonished

the jurors in his final instructions that appellant alone was on

trial, and that Roman's guilt or innocence was not a matter with

which they should concern themselves. We are confident that

these instructions, in combination, eliminated any prospect of

15

prejudice that might otherwise have flowed from the gratuitous

aside.

As a fallback position, appellant claims that the

district court's instructions did more harm than good, reminding

the jury of the substance of the improper observation. In some

respects, of course, instructions cautioning jurors to disregard

testimony may often appear to turn evidence into a form of

forbidden fruit. Every parent knows that admonitions to refrain

sometimes only emphasize the attraction. Cf. Tom Jones & Harvey 

Schmidt, Never Say No (The Fantastiks, 1960) ("My son was once 

afraid to swim; the water made him wince. Until I said he

mustn't swim; he's been swimmin' ever since."). But jurors are

not children, and our system of trial by jury is premised on the

assumption that jurors will scrupulously follow the court's

instructions. See Richardson v. Marsh, 481 U.S. 200, 206 (1987); 

Francis v. Franklin, 471 U.S. 307, 324 n.9 (1984); Sepulveda, 15 

F.3d at 1185. Here, we have no basis (apart from appellant's

self-interested speculation) to presume that the evils of the

cure exceeded those of the disease, and we therefore decline

appellant's unsupported invitation to surmise that the jury took

the wrong message from the curative instruction.

To recapitulate, given the nature of the taint, the

strength of the government's case, and the promptness of the

district court's instructions, we are unprepared to say that the

court misused its discretion in denying the mistrial motion. See 

United States v. Sclamo, 578 F.2d 888, 891 (1st Cir. 1978) 

16

(upholding a denial of mistrial after witness' improper comment,

"in light of the strong case and substantial evidence produced by

the government, and in view of the court's cautionary words to

the jury concerning stricken testimony").

C. Imposition of a Life Sentence. C. Imposition of a Life Sentence. 

In his final foray, appellant takes aim at the life

sentence imposed on count 3. Having argued earlier that the

"death results" provision of the statute of conviction, 18 U.S.C.

2119 (3), is not an element of the offense, see supra Part 

II(A), appellant now posits that the life sentence he received

punishes him for a crime Luciano's murder with which he was

never charged, and that, therefore, his sentence offends the

Constitution. We discern no constitutional infirmity.

Appellant's argument is not entirely without

foundation. We agree with him that subsection (3) demarcates a

sentence-enhancing factor, and does not establish a separate

offense with an additional element. After all, not every matter

mentioned in the text of a criminal statute comprises an element

of the offense.

To be sure, attempting to distinguish between offense

elements and sentence enhancers can sometimes be a daunting task.

When deciding how a particular statutory allusion should be

construed, an inquiring court must mull the language and

structure of the statute, and, when necessary, its legislative

history. See United States v. Forbes, 16 F.3d 1294, 1298 (1st 

Cir. 1994); United States v. Ryan, 9 F.3d 660, 667 (8th Cir. 

17

1993), modified on other grounds, 41 F.3d 361 (8th Cir. 1994) (en 

banc), cert. denied, 115 S. Ct. 1793 (1995); United States v. 

Rumney, 867 F.2d 714, 717-19 (1st Cir.), cert. denied, 491 U.S. 

908 (1989); United States v. Jackson, 824 F.2d 21, 23-24 (D.C. 

Cir. 1987).

The structure of section 2119, the unexpurgated text of

which is quoted supra at p. 5,3 strongly indicates that Congress 

intended its subsections to be sentence-enhancing factors and not

elements constituting separate species of carjacking offenses.

The initial paragraph of the statute establishes the crime of

carjacking. That paragraph ends with the word "shall," followed

by three subsections. These subsections are not structurally

independent provisions in which the essential elements of

carjacking are redefined and embellished with additional

components. Rather, the structure is integrated, and the

statutory provisions form a seamless whole.

The first subsection limns the base sentence, and the

following two subsections clear the way for enhanced sentences if

either serious bodily injury or death results from the commission

of the carjacking offense. Ripped from their textual moorings,

subsections (2) and (3) would be little more than gibberish; they

are incapable of "stand[ing] alone, independent of the

[underlying] offense." Ryan, 9 F.3d at 667. Consequently, this 

statutory structure comprises persuasive evidence that Congress

 

3The 1994 amendment, discussed supra note 1, does not affect 
our analysis of these subsections.

18

intended the second and third subsections simply to augment the

sentences for certain aggravated carjackings, not to establish

additional offenses with independent elements. Accord United 

States v. Oliver, 60 F.3d 547, 552 (9th Cir. 1995); Williams, 51 

F.3d at 1009.

Although this reading is the most natural and sensible,

especially given the interdependence of the provisions, we go the

extra mile and venture into the legislative history for

confirmation of Congress's intent. The path is plainly marked,

see Oliver, 60 F.3d at 553, and we can deduce no reason to 

retrace its contours. The Eleventh Circuit has collected and

canvassed the relevant historical materials, examined them

perspicaciously, and concluded that the background of section

2119 makes manifest that Congress intended subsection (3) to be a

sentence enhancer, not a separate offense. See id. This 

conclusion is unarguable, and we adopt it.

Having concluded that 18 U.S.C. 2119(3) is a

sentence-enhancing factor, we next consider the constitutionality

vel non of appellant's life sentence on count 3. Viewed as a 

sentence-enhancing factor, subsection (3) represents a

congressional judgment that the punishment for committing the

crime of carjacking should be harsher if the offense, as actually

perpetrated, includes conduct that produces the demise of a

victim. In this sense, the architecture of the carjacking

statute bears a family resemblance to the design of the federal

sentencing guidelines, which make generous use of "sentencing

19

enhancement regimes evincing the judgment that a particular

offense should receive a more serious sentence within the

authorized range if it was either accompanied by or preceded by

additional criminal activity." Witte v. United States, 115 S. 

Ct. 2199, 2208 (1995). For example, under U.S.S.G. 1B1.3,

"this court has repeatedly upheld the inclusion as relevant

conduct of acts either not charged or charged but dropped," and

authorized resort to that conduct as a sentence-enhancing datum.

United States v. Garcia, 954 F.2d 12, 15 (1st Cir. 1992) 

(collecting cases). By like token, a defendant convicted of drug

trafficking will find his sentence enhanced if it turns out that

he possessed a dangerous weapon during the commission of the

crime, see U.S.S.G. 2D1.1(b)(1), or if a victim died under 

circumstances that would constitute murder, see id. 2D1.1(d). 

The Supreme Court has made it pellucid that such

sentencing enhancement schemes do not constitute punishments for

separate offenses: "the fact that the sentencing process has

become more transparent under the guidelines . . . does not mean

that the defendant is now being `punished' for uncharged conduct

as though it were a distinct criminal `offense.'" Witte, 115 S. 

Ct. at 2207; see also id. at 2206-07 (explaining that the 

consideration given to particular aspects of character and

conduct at sentencing "does not result in `punishment' for any

offense other than the one of which the defendant was

convicted"). So it is here. Appellant is not being punished for

the uncharged crime of murder, but, rather, he is being punished

20

more severely for the crime of carjacking because his conduct

during the commission of the crime led to the loss of a victim's

life.

Of course, the burgeoning use of sentence enhancers by

Congress and the Sentencing Commission as part of the catechism

of punishment poses an obvious danger that, in extreme

circumstances, the lagniappe might begin to overwhelm the main

course. In all probability, there are constitutional limits on

the way sentencing factors can be deployed in the punishment of a

substantive offense. See id. at 2208; McMillan v. Pennsylvania, 

477 U.S. 79, 88 (1986). But that proposition is only of academic

interest where, as here, the sentence enhancement scheme "neither

alters the maximum penalty for the crime committed nor creates a

separate offense calling for a separate penalty." McMillan, 477 

U.S. at 87-88.

In this case, under appellant's own reading of the law,

Congress has, in essence, established a statutory maximum

sentence of life imprisonment for carjacking, and authorized

courts to levy such a sentence when a defendant's conduct results

in the victim's death. This paradigm is no different in its

legal effect than if Congress had set a statutory range of up to

life in prison, and the sentencing guidelines, through a web of

enhancement factors, had authorized a sentence of life only on a

finding by the sentencing court that the crime resulted in

21

death.4 In fine, section 2119 establishes only one offense and

sets a range of punishment for that offense, varying according to

conduct. So viewed, the sentencing scheme crosses no

constitutional boundaries.

III. CONCLUSION III. CONCLUSION

We need go no further. From aught that appears,

appellant was fairly tried, justly convicted, and lawfully

sentenced.

Affirmed. Affirmed. 

 

4One might argue that because a judge has no discretion to
impose a life sentence unless death results, 2119(c)(3) amounts 
to a "rule" establishing a separate, uncharged offense. This
argument would fail. "Regardless of whether particular conduct
is taken into account by rule or as an act of discretion, the
defendant is still being punished only for the offense of
conviction." Witte, 115 S. Ct. at 2207. 

22