UNITED STATES, Appellee,

v.

Luis E. OVALLE–MÁRQUEZ, Defendant–Appellant.

UNITED STATES, Appellee,

v.

Miguel A. RIVERA–SANTIAGO, Defendant–Appellant.

Nos. 93–1221, 93–1458.

United States Court of Appeals, First Circuit.

Heard March 11, 1994.

Decided Sept. 29, 1994.

Beverly P. Myrberg, Miami, FL, for appellant Luis E. Ovalle–Márquez.

H. Manuel Hernández, Longwood, FL, by Appointment of the Court, for appellant Miguel A. Rivera–Santiago.

José A. Quiles–Espinosa, Sr. Litigation Counsel, Hato Rey, PR, with whom Guillermo Gil, U.S. Atty., Washington, DC, was on brief for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior District Judge, and CARTER,* District Judge.

TORRUELLA, Circuit Judge.

A grand jury returned a seven-count indictment charging nine defendants, including appellants Luis Enrique Ovalle–Márquez ("Ovalle") and Miguel A. Rivera–Santiago ("Rivera"), with offenses related to the importation of cocaine, and possession of cocaine with the intent to distribute. A trial was held and the jury returned guilty verdicts against Ovalle and Rivera on four of the counts. Pursuant to the applicable sentencing guidelines, the district court then sentenced both Ovalle and Rivera to terms of life imprisonment. Ovalle and Rivera now appeal, challenging both their convictions and their sentences on a variety of grounds. We affirm.

## I. BACKGROUND

### A. Facts

The testimony and other evidence properly introduced at trial, viewed in the light most favorable to the verdicts, established the following facts. *See United States v. Rivera–Santiago,* 872 F.2d 1073, 1078–79 (1st Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989).

A paid government confidential informant, Willie Linder, alerted special agents of the Drug Enforcement Administration ("DEA") to a drug trafficking operation in the Lajas/Cabo Rojo area of Puerto Rico. Linder, a German citizen, is a fisherman who has lived in Puerto Rico since 1960.

On November 27, 1991, Linder met with Ovalle, Rivera, co-defendants Sergio Monteagudo–Martínez ("Monteagudo"), and Humberto Artunduaga–Alvarado in Las Cuebas, Puerto Rico. (Monteagudo entered into a plea agreement with the government and testified for the prosecution). At this meeting, these individuals planned to import ap-

* Of the District of Maine, sitting by designation.

proximately 800 kilograms of cocaine (approximately 22 bales), which was to be first airdropped in waters off the coast of the Dominican Republic, and then brought into Puerto Rico. The meeting's participants planned to use two vessels—Linder would captain his own boat, and Monteagudo would captain the other boat. These vessels would depart from Puerto Rico for a location off the coast of Punta Espada, Dominican Republic, where, with the help of some other people unknown to them, they would load the cocaine onto the vessels. Tentatively, they scheduled the smuggling venture for sometime between December 8–13, 1991.

On November 29, 1991, Ovalle and Artunduaga delivered $1000 to Linder for the purpose of enabling Linder to repair his boat. Thereafter, and up until December 9, Ovalle and Artunduaga sporadically met with Linder to inquire about the status of the repairs to his boat, and to provide Linder with additional money to complete the repairs.

Rivera apparently became suspicious of Linder, and the defendants did not then include Linder in the smuggling operation planned for early December. On or about December 7, 1991, Ovalle, Rivera and Monteagudo, as well as others, met to finalize the plans for the smuggling operation, without Linder's help. At this December 7 meeting, Rivera gave Monteagudo two firearms, a .38 caliber revolver and a .22 caliber pistol. Ovalle loaded the firearms for Monteagudo.

On December 9, 1991, Monteagudo, codefendant Santos Victor Chala–Ramos ("Chala"), and two other men from the Dominican Republic, picked up 21 bales, containing approximately 800 kilograms of cocaine, off the coast of Santo Domingo, Dominican Republic, after giving a pre-arranged signal to a plane flying nearby. Because one of the boats that Monteagudo had planned to use to pick up the cocaine was damaged, he decided to take one boat with 11 bales of cocaine, and leave 10 bales of cocaine hidden on a nearby beach, guarded by the two man crew of the damaged boat.

On December 11, 1991, Monteagudo proceeded to import 11 of the 21 bales of cocaine into Puerto Rico. Unknown persons, however, began to pursue Monteagudo's boat, and

Monteagudo and the other Dominican man on board (known to Monteagudo as "Queque"), threw seven bales into the water in an attempt to halt the pursuit and minimize the loss of the entire load. Monteagudo eventually delivered the remaining four bales to Ovalle and Rivera.

The defendants then arranged to import the rest of the cocaine that had been left behind in the Dominican Republic. On December 12, Ovalle and Rivera met with Linder to survey areas, including Playita Rosada in La Parguera, Puerto Rico for possible landing sites to import the additional cocaine.

On December 13, Ovalle, Rivera and Artunduaga met with Linder at his home to obtain his help in importing the other ten bales of cocaine. Linder was instructed to meet with Ovalle in Ponce for further instructions. Linder then met with Ovalle and another man as arranged. The men then went to Rivera's home, where Linder left his car, and Rivera, Ovalle, Linder and the other man then proceeded to a pier in Ponce. Monteagudo met them there, and Monteagudo and Linder then departed in a boat for Lajas, Puerto Rico. Sometime during the day, Linder contacted DEA agents and advised them of the planned venture.

On December 14, Monteagudo and Linder departed Puerto Rico to a rendezvous point near Saona, Dominican Republic, where they were assisted by several Dominican men in the loading of the remaining ten bales of cocaine (372 kilograms). On the following day, Monteagudo and Linder returned to Playita Rosada, where DEA agents seized the cocaine and arrested Monteagudo. DEA agents subsequently arrested Ovalle and Rivera.

### B. Procedural Background

On June 3, 1992, a grand jury returned a second superseding seven count indictment against Ovalle and Rivera, and seven other defendants. Counts One and Two of the indictment charged the defendants with conspiring to import, and possess with the intent to distribute, approximately 800 kilograms of cocaine from November 27 to December 17, 1991, in violation of 21 U.S.C. §§ 841(a)(1),

846, 952(a) and 963. Count Three charged the defendants with aiding and abetting the importation of approximately 418 kilograms of cocaine on December 11, 1991 in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2. Count Four charged the defendants with aiding and abetting the possession with intent to distribute approximately 150 kilograms of cocaine on December 11, 1991, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts Five and Six charged the defendants with aiding and abetting the importation, and possession with intent to distribute, 372 kilograms of cocaine on December 15, 1991, in violation of 21 U.S.C. § 841(a)(1) and 952(a), and 18 U.S.C. § 2. Count Seven charged the defendants with aiding and abetting the use and carrying of firearms in relation to a drug offense, in violation of 18 U.S.C. § 924(c)(1).

The trial commenced on August 25, 1992, and the jury returned guilty verdicts against Ovalle and Rivera on Counts One, Two, Five and Six. The jury acquitted all of the defendants, including Ovalle and Rivera, of the charges in Counts Three, Four and Seven.

On January 22, 1993, the court held a sentencing hearing and determined that Ovalle's total offense level was 46, and that his Criminal History Category was I, therefore making his guideline sentencing range life imprisonment. The court then sentenced Ovalle to four concurrent sentences of life imprisonment.

At a sentencing hearing on April 2, 1993, the court determined that Rivera's total offense level was 47, and that his Criminal History Category was I, which also mandated a sentencing guideline range of life imprisonment. The court then sentenced Rivera to four concurrent sentences of life imprisonment.

Rivera and Ovalle now allege a number of grounds to challenge both their convictions and sentences.

## II. *DID THE DISTRICT COURT IMPROPERLY LIMIT CROSS-EXAMINATION?*

■ Rivera contends that the district court improperly limited his counsel's cross-examination of two government witnesses, and that this denied Rivera his Sixth Amendment right to confront adverse witnesses. The Confrontation Clause of the Sixth Amendment guarantees an accused in a criminal proceeding the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 1434, 89 L.Ed.2d 674 (1986); *United States v. Alvarez*, 987 F.2d 77, 82 (1st Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 147, 126 L.Ed.2d 109 (1993). The Confrontation Clause secures an accused the right to cross-examine adverse witnesses in order to test "the believability of a witness and the truth of his testimony." *United States v. Carty*, 993 F.2d 1005, 1009 (1st Cir.1993) (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)); *Alvarez*, 987 F.2d at 82 (citations omitted). The right to cross-examine an adverse witness, however, is not unlimited. *United States v. Corgain*, 5 F.3d 5, 8 (1st Cir.1993); *Carty*, 993 F.2d at 1009; *Alvarez*, 987 F.2d at 82.

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435; *see also Carty*, 993 F.2d at 1010; *Alvarez*, 987 F.2d at 82; *United States v. Moore*, 923 F.2d 910, 913 (1st Cir.1991).

■ We review a trial court's decision to limit cross-examination under an abuse of discretion standard. *Carty*, 993 F.2d at 1011; *United States v. Twomey*, 806 F.2d 1136, 1140 (1st Cir.1986).

> In order to establish that the trial judge abused his discretion in limiting cross-examination, the defendant must show that the restrictions imposed were clearly prejudicial.... An abuse of discretion has occurred only if the jury is left without "sufficient information concerning formative events to make a 'discriminating appraisal' of a witness's motives and bias."

*Twomey*, 806 F.2d at 1140 (quoting *United States v. Campbell*, 426 F.2d 547, 550 (2d

Cir.1970)) (internal citations omitted). Rivera has made no such showing.

■ Rivera contends that his right to cross-examine adverse witnesses was unfairly restricted on four occasions. First, Rivera argues that he was not fully permitted to cross-examine the confidential informant, Linder, regarding whether Linder had ever been a member of "Hitler's Youth League," or a member of the French Foreign Legion, an organization known for being soldiers of fortune. Rivera claims that this testimony was relevant in order to show that Linder was familiar with guns, and that Linder was a mercenary willing to do anything for money.

■ With respect to Linder's alleged membership in Hitler's Youth League, Rivera's counsel failed to establish any foundation showing how this line of questioning would establish that Linder was familiar with guns. The record indicates that after the trial judge very patiently informed counsel that he needed to establish the relevance of this question, and that he needed to lay some sort of foundation for this question, Rivera's counsel did not pursue this specific line of questioning. Thus, counsel, and not the court, effectively cut off his own cross-examination. Moreover, the fact that Linder may have been a member of Hitler's Youth League when he was 9 years old was of virtually no relevance to this case, and the trial judge would have acted well within his discretion in not permitting this line of questioning. With respect to Linder's membership in the French Foreign Legion, the record shows that Rivera's counsel was able to cross-examine Linder adequately, and that Linder admitted that he learned about guns while in the French Foreign Legion, and that he was paid for serving in this organization.[1]

■ Second, Rivera contends that the court improperly limited his cross-examination of Monteagudo with respect to his attempts to cast doubt on Monteagudo's veracity and objectivity. Rivera's counsel asked Monteagudo about the true name of "Queque," the man who had accompanied Monteagudo when he attempted to smuggle the eleven bales of cocaine into Puerto Rico on December 11,[2] and the true name of Monteagudo's wife, in an attempt to show that "Queque" and his wife were cousins, and that Monteagudo had a reason to steal part of the shipment of cocaine with "Queque."

> Defense Counsel: Okay, So you were traveling with this fellow Queque and he's Dominican like you; yes or no?
>
> Monteagudo: Yes, sir.
>
> Defense Counsel: And who is a friend of yours?
>
> Monteagudo: Yes, sir.
>
> Defense Counsel: And whose real name is Nelson Mota; yes or no?
>
> Monteagudo: I don't know his true name.
>
> Defense Counsel: Your wife's name is Iris Mota; isn't it?
>
> Prosecutor: We have an objection.

A lengthy sidebar conference was then held, and the district court stated that defense counsel could ask Monteagudo if he knew what "Queque's" true name was, but that counsel could not interject Nelson Mota's name into the question unless he had some good faith basis to show that "Queque's" true name was in fact Nelson Mota. Defense counsel stated that his investigation showed that "Queque's" true name was Nelson Mota, but counsel was not able to point to any specific fact, or to specifically identify any potential witness who would be able to support the conclusion of his supposed investigation. The district court then refused to permit Rivera's counsel to pursue the line of

---

1. Rivera claims that he was prejudiced by the fact that he was only able to pursue his cross-examination regarding Linder's involvement in the French Foreign Legion after being "required to fully explain the basis of this line of questioning, within ear shot of the witness, thereby revealing his defense strategy ..." After examining the record, we find Rivera's allegation that the trial court somehow required him to disclose his defense strategy within hearing distance of the witness to be preposterous. Moreover, if Rivera's counsel was worried that the witness would overhear him explain the basis of his line of questioning, counsel should have kept his voice down, or requested that the witness be repositioned during the sidebar conference.

2. In the indictment, "Queque" was identified as co-defendant Carlos Cruz–Santiago, and he remained a fugitive throughout the proceedings.

questioning which expressly linked the name of Nelson Mota to "Queque."

■ The district court did not abuse its discretion in determining that Rivera's counsel had failed to establish a good faith basis to warrant further inquiry regarding the true name of "Queque." *See, e.g., Carty,* 993 F.2d at 1010; *Rivera–Santiago,* 872 F.2d at 1085. While the purpose of cross-examination is to impeach the credibility of a witness, the basis for the impeachment cannot be speculation and innuendo with no evidentiary foundation. *Rivera–Santiago,* 872 F.2d at 1085. There was simply no evidentiary basis for defense counsel's theory that "Queque" and Monteagudo's wife, Iris Mota, were related. Nor was there any substantiated basis showing that, based on this alleged relationship, Monteagudo and "Queque" collaborated to steal some of the cocaine.

■ The third alleged instance of the court improperly curtailing cross-examination involved defense counsel's questioning of Monteagudo regarding the terms of his plea agreement with the government. Specifically, Rivera's counsel asked Monteagudo if when he entered into the plea agreement, the government told him that if he cooperated there was the possibility that he could go free without serving any jail time at all. Monteagudo replied no. Rivera's counsel then asked him if he otherwise knew that there was a possibility he could go free if he entered into a plea agreement. The government objected, and the court sustained the

objection, stating that Monteagudo had just testified that he had not been told that.

A review of the record makes it clear that the jury was well aware of the fact that Monteagudo had entered into a plea agreement with the government, and that he would receive favorable treatment in exchange for his testimony. On direct examination, Monteagudo stated that he had entered into a plea agreement with the government, and the agreement was admitted into evidence. The jury could therefore see precisely what benefits Monteagudo was given in exchange for his cooperation. On cross-examination, Monteagudo also stated that he knew he was facing a sentence of 15 years to life when he decided to cooperate with the government. This evidence provided the jury with sufficient information to make a discriminating appraisal of Monteagudo's motives and biases.[3] *See, e.g., Twomey,* 806 F.2d at 1139–40.

■ As a fourth ground, Rivera claims that the court improperly cut off his cross-examination of Monteagudo regarding his understanding of his oath to tell the truth. The court sustained an objection by the prosecutor regarding whether Monteagudo knew that he was suppose to tell the truth. The record shows that Rivera's counsel had previously made several references to the fact that Monteagudo was under oath and that he had an obligation to tell the truth. On the occasion that the court sustained the objec-

**3.** After the court excluded the question of Rivera's counsel, the court stated that it would instruct the jury regarding the plea agreement. In its final charge, the court explained the circumstances surrounding the testimony of a co-defendant who had pled guilty. *The court stated:*

In this case, there has been testimony from a government witness who pled guilty after entering into an agreement with the government to testify. There is evidence that the government agreed to dismiss some charges against the witness in exchange for the witness' agreement to plead guilty and testify at this trial against the defendants.

The government also promised to bring the witness' cooperation to the attention of the sentencing court, and you all heard that. The *government is permitted to enter into this kind* of plea agreement. You in turn may accept the testimony of such a witness and convict the defendants on the basis of this testimony alone,

if it convinces you of the defendants' guilt beyond a reasonable doubt. However, you should bear in mind that a witness who has entered into such an agreement has an interest in this case different than the ordinary witness. A witness *who realizes that he may be able to* obtain his own freedom or receive a lighter sentence by giving testimony favorable to the prosecution has a motive to testify falsely. Therefore, you must examine the testimony with caution and weigh it with great care and if after scrutinizing his testimony you decide to accept it you may give it whatever weight, if any, you find it deserves.

We do not believe that the court improperly limited cross-examination regarding the plea agreement. Moreover, in light of this final instruction, we do not believe that Rivera has grounds to complain that any limitation on cross-examination in that regard prejudiced his ability to attack Monteagudo's credibility.

tion, it acted well within its discretion by cutting off repetitive questioning.

As a final matter, we have reviewed the entire cross-examination of both Linder and Monteagudo. The cross-examination of each witness was thorough, and we believe that the jury had sufficient information regarding the witnesses' motives and biases to judge the credibility of the witnesses and the truthfulness of their testimony.

## III. *PROSECUTORIAL MISCONDUCT?*

■ Rivera and Ovalle both claim that the prosecutor engaged in misconduct by improperly tying the defendants to a conspiracy with Colombian ties, despite the lack of evidence of any such international drug ring. Specifically, Rivera and Ovalle claim that references in the prosecutor's closing argument to certain testimony by Monteagudo were improper. The prosecutor stated:

> This is a well organized conspiracy. And from where you can reason that? You remember November 27, the planning. From where that cocaine was coming? From *Colombia, South America*. Therefore, you can reasonably infer that some of these defendants have contacts in *Colombia*, because otherwise who would call them to bring and to make the airdrop.... This is an organization. It's a conspiracy not only in Puerto Rico, but also in *Colombia*.

The prosecutor also argued:

> It's the fact that when Sergio Monteagudo communicated with the plane using this code the plane responded. He knew what that man at the sea was talking about. Therefore, someone in the conspiracy con-

tacted back to *Colombia* and say to the plane or some person: Hey, the code for the load, the air drop of the cocaine, that the code is "Leandro" and "Matilde."

Rivera and Ovalle suggest that the remarks were intended to inflame the passions of the jury, members of which are bombarded daily with superheated rhetoric of the government's war on drugs, and the prominent role that Colombia plays as a principal source of drugs.

■ To warrant reversal of a conviction on the grounds of a prosecutor's improper jury argument, a court must find that the prosecutor's remarks were both inappropriate and harmful. *See United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Arguments which urge a jury to act in any capacity other than as the impartial arbiter of the facts in the case before it, such as arguments that serve no purpose other than to inflame the passions and prejudices of the jury, are improper. *United States v. Manning,* 23 F.3d 570, 574 (1st Cir.1994); *Arrieta–Agressot v. United States,* 3 F.3d 525, 527 (1st Cir.1993).

■ We do not believe that the prosecutor's remarks in his closing were improper. During the trial, Monteagudo testified that Ovalle had told him that the cocaine was coming from Colombia, and this was an admissible hearsay statement of a co-conspirator.[4] *See* Fed.R.Evid. 801(d)(2)(E). In his closing argument, the prosecutor then did what he was entitled to do—ask the jury to draw warrantable inferences from the evidence admitted during trial—that the conspiracy was importing cocaine from Colombia into Puerto Rico. *United States v. Tajeddi-*

---

4. Defense counsel argues that the court erred in admitting Monteagudo's testimony that Ovalle had told him the cocaine was coming from Colombia. Defense counsel had previously objected that Monteagudo could not testify that he knew that the cocaine was coming from Colombia unless he in fact had such personal knowledge. The court effectively sustained this objection and Monteagudo did not testify that he had personal knowledge that the cocaine was coming from Colombia. Rather, Monteagudo then testified that he only had second hand knowledge that the cocaine came from Colombia based on Ovalle's statement to him, and defense counsel did not object to this testimony. Any error in the admission of the evidence was not preserved for appeal. *See United States v. Rosales,* 19 F.3d 763, 765 (1st Cir.1994). Our standard of review under the circumstances is therefore "plain error," and we will reverse only if the error "seriously affected the fairness, integrity, or public reputation of [the] judicial proceeding." *Id.* (citations omitted). We answer the underlying question—did the court err in admitting the evidence—in the negative. We do not believe that the prejudice associated with admitting Ovalle's statement outweighed the relevance of that evidence, and the court did not abuse its discretion in admitting that statement.

*ni,* 996 F.2d 1278, 1283 (1st Cir.1993) (citations omitted); *see also United States v. Moreno,* 947 F.2d 7, 8 (1st Cir.1991); *United States v. Abello–Silva,* 948 F.2d 1168, 1182 (10th Cir.1991), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). The jury thus had a complete view of the conspiracy's efforts to import cocaine—conspirators picked up cocaine in Colombia, airdropped it to waiting associates off the coast of the Dominican Republic, who then transported the cocaine by boat into Puerto Rico. Despite the contentions of Ovalle and Rivera to the contrary, the prosecutor's remarks were not the type, and did not approach the level, of rhetoric we have previously found to be improper because it served no other purpose but to inflame the passions and prejudices of the jury. *See, e.g., Arrieta–Agrèssot,* 3 F.3d at 527 (finding that prosecutor's remarks which urged jury to consider case as a battle in the war against drugs and defendants as enemy soldiers, and remarks which referred to the corruption of "our society" and the poisoning of "our children," inflammatory and not permissible argument); *United States v. Machor,* 879 F.2d 945, 955–56 (1st Cir.1989) (finding prosecutor's remarks in closing statement that cocaine was "poisoning our community and our kids die because of this" was inappropriate), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).[5]

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL?

■ Rivera claims on appeal that he was deprived of effective assistance of counsel at trial, because of an alleged conflict of interest based on the relationship between his attorney and the attorney who represented Monteagudo, who was one of the main government witnesses during the trial. Rivera's attempt to raise this claim for the first time here on appeal is ill-timed. "[A] fact-specific claim of ineffective legal assistance cannot be raised initially on direct review of a criminal conviction, but must originally be presented to the district court." *United States v. Hunnewell,* 891 F.2d 955, 956 (1st Cir.1989) (quoting *United States v. Costa,* 890 F.2d 480, 482–83 (1st Cir.1989)) (other citations omitted). Rivera did not present a claim to the district court showing that this conflict of interest deprived him of effective legal assistance. Additionally, the record is not developed enough as a factual matter to enable us to consider this issue. *See, e.g., Costa,* 890 F.2d at 483. We therefore reject Rivera's claim as premature, but do so without prejudice to Rivera's right to bring such a claim under 28 U.S.C. § 2255.

## V. SENTENCING ISSUES

### A. Standard of Review

■ Ovalle and Rivera challenge the district court's application of the sentencing guidelines in determining their sentences on a number of grounds. When we review a district court's application of a sentencing guideline, we utilize a bifurcated process. First, we review the guideline's legal meaning and scope *de novo. United States v. Brewster,* 1 F.3d 51, 54 (1st Cir.1993) (citing *United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992)). Next, we review the court's factfinding for clear error, giving due deference to the court's application of the guidelines to the facts. 18 U.S.C. § 3742(e); *Brewster,* 1 F.3d at 54 (citing *St. Cyr,* 977 F.2d at 701). We also note that factbound matters related to sentencing need only be

---

5. Ovalle and Rivera argue that there was a continuing pattern of prosecutorial misconduct in this case due to the government's endless objections during cross-examination, derogatory comments about defense counsel in front of the jury, demeaning lectures to defense counsel, and other abusive tactics which deprived defendants of a fair trial. Specifically, they point to an incident where the prosecutor allegedly improperly vouched for the credibility of a government witness by stating that the witness was telling the truth. We have reviewed the record with respect to this instance, and after considering the prosecutor's alleged indiscretion in the context of an awkward colloquy following defense counsel's question regarding whether the witness understood he had an obligation to tell the truth, and the court's subsequent instruction that it was up to the jury to determine if the witness was telling the truth, we do not believe that there was any prejudicial error. Additionally, we have reviewed the entire record with a view for the other alleged improprieties, and we do not believe that there was a continuing pattern of prosecutorial misconduct.

supported by a preponderance of the evidence. *United States v. Corcimiglia,* 967 F.2d 724, 726 (1st Cir.1992) (citations omitted).

## B. Rivera's Sentencing Challenges

Rivera was convicted of four drug related charges. At sentencing, the court accepted the Presentence Report's ("PSR") analysis that because Rivera was convicted of conspiracy to import approximately 800 kilograms of cocaine, and conspiracy to possess with the intent to distribute approximately 800 kilograms of cocaine, the appropriate sentencing guideline was § 2D1.1.[6] The base offense level ("BOL") is determined by § 2D1.1(c)(2), which is based on the total amount of controlled substances involved. Because the offenses involved 800 kilograms of cocaine, the BOL was determined to be 40.[7]

The court then enhanced the BOL by applying several upward adjustments, over Rivera's objections. The court applied a two level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(1), because the court found that Rivera possessed firearms during the commission of the offense. Pursuant to § 3B1.1(b), the court increased the BOL by three because it found that Rivera was a supervisor in a criminal activity involving five or more participants. The court also made an upward adjustment of two, under U.S.S.G. § 3C1.1, based on its finding that Rivera obstructed justice by perjuring himself, and attempting to coax a co-defendant into providing false information to a probation officer. The court determined that the total offense level was 47, and because Rivera's Criminal History Category was I, he therefore faced a guideline sentencing range of life imprisonment. The court then sentenced Rivera to serve concurrent terms of life imprisonment as to the four counts.

6. All references to the Sentencing Guidelines are to the 1992 guidelines, which were in effect at the time the court sentenced Rivera and Ovalle.

7. Pursuant to § 3D1.2(d), counts one, two, five and six were grouped together into a combined offense level because the counts involve the same general type of offense.

8. Rivera argues that in denying each of Rivera's objections to his sentence, the court incorrectly

## 1. The District Court's Finding Regarding the Quantity of Drugs

The district court determined Rivera's BOL on the basis of his and his co-conspirators' conduct, and the total amount of drugs involved in the conspiracy, approximately 800 kilograms of cocaine. The court rejected Rivera's contention that it should decrease the relevant quantity of cocaine to 372 kilograms because Rivera was acquitted on the substantive charges of importing and possessing 418 kilograms of the 800 kilograms of cocaine involved in the case.[8] The court stated:

[I]n any event, on the preponderance of the evidence the Court finds that this defendant had jointly undertaken this criminal activity and is held accountable of the conduct of others. And that he was found guilty by the jury on eight hundred kilos [in] the Count charged.

And so that the Court finds that—rules that it's not going to lessen by two points the three hundred and seventy-two kilo amount under the relevant conduct issue.

When a defendant has been convicted of a drug related offense, a key factor in constructing the defendant's sentence is the quantity of narcotics attributable to him, a factor which is determined by looking at the sum of the charged conduct of which the defendant was convicted, plus his "relevant" conduct. *See United States v. Garcia,* 954 F.2d 12, 15 (1st Cir.1992) (citations omitted); *see also United States v. Innamorati,* 996 F.2d 456, 488 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 409, 126 L.Ed.2d 356 (1993); U.S.S.G. § 2D1.1. The court determines the drug quantity by looking at all acts "that were part of the same course of conduct or

believed that its hands were tied and that the court believed that it was required as a matter of law to reject Rivera's contentions. Other than making this general allegation, however, Rivera does not point to any specific instances. Moreover, we do not read the record this way, and do not believe that the court incorrectly interpreted its legal authority with respect to the various sentencing issues.

common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *Garcia*, 954 F.2d at 15; *United States v. Mak*, 926 F.2d 112, 113 (1st Cir.1991). In the case of jointly undertaken criminal activity, such as a conspiracy, a defendant is accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, [or] in preparation for that offense...." U.S.S.G. § 1B1.3(a)(1)(B); *see Innamorati*, 996 F.2d at 488. A court's determination regarding the amount of drugs involved in an offense will only be set aside on appeal if it is clearly erroneous. *See Innamorati*, 996 F.2d at 489.

The jury convicted Rivera of Counts One and Two, which charged Rivera with conspiracy to import, and to possess, 800 kilograms of cocaine. At sentencing, the court seemingly looked to U.S.S.G. § 1B1.3(a)(1)(B) and found that Rivera, and his cohorts, had jointly undertaken this criminal activity, and Rivera was accountable for the other's conduct in attempting to import and possess all 800 kilograms of cocaine. The court's finding was supported by evidence introduced at trial. Both Linder and Monteagudo testified that they met with Rivera, Ovalle, and another co-defendant on November 27, 1991, and that at this meeting they planned to import into Puerto Rico, 22 bales of cocaine (800 kilograms) which were to be airdropped off the coast of the Dominican Republic. Testimony by Monteagudo showed that the original scheme to import the cocaine did not proceed precisely according to plan, because of boat problems and a pursuit by unknown individuals who unexpectedly chased the conspirators in their boat on December 11, forcing them to dump some of the cocaine overboard. Testimony by Linder and Monteagudo indicated that Rivera and Ovalle then helped to salvage the original plan and adapt it—by calling Linder into service and helping him obtain a boat, so that Linder and Monteagudo could go to the Dominican Republic, and pick up and import the rest of the cocaine. Thus, the court did not err by implicitly concluding that Rivera helped plan the logistics of the scheme to import the entire 800 kilograms, and therefore the subsequent acts by his co-conspirators to execute this scheme were in furtherance of, and reasonably foreseeable in connection with, the jointly undertaken felonious plan.

Rivera contends that the verdicts regarding the substantive drug charges should guide the court in determining the correct quantity of cocaine instead of the conspiracy charges. The operative indictment grouped all of the cocaine involved in the December 11, 1991 and the December 15, 1991 shipments of cocaine together (800 kilograms) in Count One and Two, the conspiracy charges. The indictment then broke down the substantive charges into the two distinct shipments of cocaine that the defendants had allegedly attempted to import and possess. The jury only convicted Rivera of the substantive charges related to the December 15 shipment, involving 372 kilograms of cocaine (Counts Five and Six), and acquitted Rivera, and all of his co-defendants, with respect to the December 11, 1991 shipment, involving 418 kilograms of cocaine (Counts Three and Four). Therefore, Rivera contends that it was improper for the court to include the amount of cocaine involved in the charges of which he was acquitted, in determining his BOL.

The fact that Rivera was acquitted of the substantive charges involving the 418 kilograms of cocaine does not mean, however, that the court could not consider that conduct as "relevant conduct." When determining relevant conduct, a sentencing court may consider acts which were not charged, as well as the facts underlying a prior acquittal when these facts "appear reliable." *Garcia*, 954 F.2d at 15; *United States v. Mocciola*, 891 F.2d 13, 17 (1st Cir.1989) (citation omitted); *see also United States v. Weston*, 960 F.2d 212, 218 (1st Cir.1992) (stating in dicta that an acquittal is not always conclusive on an issue for sentencing purposes due to differing standards of proof). As we have previously noted, testimony by both Linder and Monteagudo indicated that Rivera planned to import 800 kilograms of cocaine, including the 418 kilograms of cocaine which was the basis for Counts Three and Four. There was no clear error in the court's decision to credit the testimony of Linder and Monteagudo at

sentencing, and then consider Rivera's conduct with respect to the 800 kilograms of cocaine, when the court determined Rivera's BOL. *See, e.g., Innamorati,* 996 F.2d at 489; *Garcia,* 954 F.2d at 16; *United States v. Sklar,* 920 F.2d 107, 110 (1st Cir.1990).

### 2. The Firearm Enhancement

■ Rivera makes a similar challenge to the court's decision to enhance his sentence pursuant to U.S.S.G. § 2D1.1, because the court found that a firearm was possessed during the commission of the drug offenses. Rivera argues that the testimonial evidence linking him and his co-defendants to a firearm was extremely weak, especially in light of the fact that no firearm was ever found. Additionally, because the jury acquitted Rivera and his co-defendants of Count Seven, which charged them with aiding and abetting the carrying of a firearm in relation to the commission of the offense, Rivera contends that there was no basis for the court to enhance his sentence.

■ U.S.S.G. § 2D1.1(b)(1) directs a sentencing court to enhance a defendant's BOL if a dangerous weapon, including a firearm, was possessed. The commentary to § 2D1.1 states that the sentencing court should impose the enhancement "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 comment (n. 3); *United States v. Castillo,* 979 F.2d 8, 10 (1st Cir. 1992); *Corcimiglia,* 967 F.2d at 727. The First Circuit has followed this "clearly improbable" standard. *Corcimiglia,* 967 F.2d at 726; *United States v. Ruiz,* 905 F.2d 499, 507 (1st Cir.1990). We have found that:

> when the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapons to the offense conduct....

*Corcimiglia,* 967 F.2d at 727; *see also Castillo,* 979 F.2d at 10. The defendant then has the burden to come forward with evidence · demonstrating the existence of special circumstances that would render it "clearly improbable" that the weapon's presence has a connection to the narcotics trafficking. *Castillo,* 979 F.2d at 10; *Corcimiglia,* 967 F.2d at 727–28.

As we have previously discussed, the court is entitled to consider "relevant" conduct at sentencing, and this may include conduct which was the basis for charges that the defendant was acquitted of, as long as the evidence which establishes that conduct was reliable. *Mocciola,* 891 F.2d at 16–17. The court considered such relevant conduct here when it decided to apply the U.S.S.G. § 2D1.1 enhancement. The court found:

> There's no question in my mind that there was a gun there. Willie, the Confidential Informant, talked about it. Talked about taking the bullets out. Try to make it inoperable. And then we have Monteagudo who said that he received two guns, as a matter of fact, from this defendant. And there is a gun.

The court then acknowledged that Rivera had been acquitted of the firearms charge, but stated that because the court had found that guns were possessed in connection with the narcotics transactions, and Rivera did not convince the court that it was clearly improbable that the gun would have been used in connection with these narcotic transactions, it was going to apply the enhancement.

The court's finding was supported by evidence in the record and was not clearly erroneous. Monteagudo testified that on December 7, at a meeting with Rivera, Ovalle, and others, to finalize the plans for the smuggling operation, Rivera gave Monteagudo two firearms, a .38 caliber revolver and a .22 caliber pistol. It was certainly reasonable for the court to conclude that Rivera had given the two firearms to Monteagudo, who was about to leave on his foray to pick up 800 kilograms of cocaine, to facilitate this smuggling plan. With the guns, Monteagudo could protect himself, and his co-conspirators, as well as the large quantity of cocaine they were to pick up. Additionally, Linder testified that Monteagudo had in fact brought a .22 caliber pistol with them on December 15, when he and Monteagudo went to the Dominican Republic to pick up the remaining ten bales of cocaine and bring the

cocaine to Puerto Rico. Thus, absent circumstances showing that it was clearly improbable that the firearms were connected to the drug offense, there was sufficient evidence to support the enhancement. Rivera has not claimed that any such special circumstances existed. The court therefore properly applied the U.S.S.G. § 2D1.1 enhancement.

### 3. The Supervisory and Managerial Role Enhancement

 Rivera challenges the three-level enhancement for playing a supervisory role which the court imposed pursuant to U.S.S.G. § 3B1.1(b), claiming that the evidence demonstrated he was an underling, who merely followed orders in this organization. The court found that "the defendant's role is of a manager/supervisor and it has been adequately supported by this record." We review this role-in-the-offense ruling for clear error. *United States v. Jadusingh*, 12 F.3d 1162, 1169 (1st Cir.1994) (citation omitted); *United States v. Rodríguez Alvarado*, 985 F.2d 15, 19 (1st Cir.1993) (citations omitted).

 A three-level enhancement under U.S.S.G. § 3B1.1(b) is appropriate if the government shows that the defendant 1) was a manager or supervisor of the criminal activity (but not a leader or organizer); and 2) the criminal activity involved five or more participants or was otherwise extensive. *Rodríguez Alvarado*, 985 F.2d at 20. The terms "manager" and "supervisor" are not defined in the guidelines. A court can find that a defendant is a manager or supervisor where he "exercised some degree of control over others involved in the commission of the crime or he [was] responsible for organizing others for the purpose of carrying out the crime." *See Rodríguez Alvarado*, 985 F.2d at 20 (quoting *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir.1990)).

The court did not err in finding that Rivera played a managerial or supervisory role in the drug smuggling operation. The record supports the conclusion that Rivera played a predominant role in planning and organizing the logistics of this criminal operation: 1) Rivera was present at the November 27 planning meeting; 2) Rivera gave Ovalle and Linder instructions with respect to making sure Linder's boat was available to import the cocaine; 3) Rivera initially became suspicious of Linder, and then held a meeting where it was decided that Linder would be cut out of the initial attempt to import the cocaine; 4) Rivera procured another boat to be used by his cohorts in the initial attempt to import the 800 kilograms of cocaine; 5) Rivera provided Monteagudo with two firearms to be used during the drug smuggling operations; and 6) Rivera, along with Ovalle, met with Linder with respect to the logistics of importing the remaining cocaine which had been left behind in the Dominican Republic. There is also no dispute that more than five individuals were involved in the drug smuggling plan. The court properly applied the U.S.S.G. § 3B1.1(b) enhancement.

### 4. The Obstruction of Justice Enhancement

 The government requested that the court enhance Rivera's sentence pursuant to U.S.S.G. § 3C1.1, based on Rivera's obstruction of justice. The government based this request on two factors: 1) that Rivera had provided a false statement to the probation officer at a presentence interview to the effect that he was not involved in the November 27 planning meeting, when evidence presented at trial showed that Rivera was in fact present and actively participated in this meeting; and 2) after being found guilty, Rivera sent a letter to co-defendant Chala instructing him to provide false information to the probation officer to the effect that Monteagudo had misled Chala, that Chala was unaware of the plan to pick up the cocaine that was to be airdropped off the coast of the Dominican Republic, and that none of the defendants had anything to do with this smuggling operation. At sentencing, the court found that:

Well, I read the letter and the—and unfortunately there are parts of it that I read and said well this could be an individual writing to another individual saying to him that, you know, they're not guilty. And remember—and just reminding him of the

fact that they're not guilty and that they have nothing to do with it. Unfortunately, the letter goes beyond that. There's instructions. Actual instructions as to what to tell people and just to—. . .

And besides that there is another matter of the perjury.

The court then applied the two level enhancement for obstruction of justice.

United States Sentencing Guidelines § 3C1.1 provides that "if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." The enhancement applies where a defendant provides "materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1, commentary n. 3(h); See United States v. Olea, 987 F.2d 874, 877 (1st Cir. 1993). The enhancement also applies where a defendant commits, suborns or attempts to suborn perjury. U.S.S.G. § 3C1.1, commentary n. 3(b); See United States v. Gonzáles, 12 F.3d 298, 299 (1st Cir.1993) (finding that the obstruction of justice enhancement was warranted where the defendant attempted to coax an acquaintance into bearing false witness about a matter material to the case). The test for materiality of an alleged perjured matter is not a stringent one, and the term is defined to include any "fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, commentary n. 5; United States v. St. Cyr, 977 F.2d 698, 705 (1st Cir.1992).

We review a court's factual findings with respect to an obstruction of justice enhancement for clear error. See Gonzáles, 12 F.3d at 299; Weston, 960 F.2d at 220. The court found that Rivera had perjured himself during the presentence interview with the probation officer. The court would have been justified in applying the enhancement based on this finding alone, because Rivera's prevarication regarding his role in the smuggling plan was material, in that it could have influenced the probation officer's investigation, and ultimately affected his determination of Rivera's offense level.

Additionally, the court heard testimony and argument regarding the letter Rivera sent to Chala, and implicitly found that the letter was authentic, that Chala had received it, and that Rivera's letter specifically instructed Chala to lie to the probation officer. Statements Chala would make to the probation officer regarding what occurred during the drug smuggling operation, and statements attempting to portray Monteagudo as the sole wrongdoer, were material in that they could have influenced or affected various sentencing issues related to the determination of offense levels, such as relevant conduct and various defendants' roles in the offense. See, e.g., Olea, 987 F.2d at 877 (defendant's statements that he was an unwitting dupe and that he had nothing to do with two drug sales were material for purposes of U.S.S.G. § 3C1.1 because they would tend to influence or affect the calculation of his base offense level). This finding therefore also supports the application of the enhancement. See, e.g., St. Cyr, 977 F.2d at 705 (stating that presentence reports are an important ingredient of the sentencing process, and providing materially false information to a probation officer in respect to a presentence report is culpable and can constitute obstruction of justice even absent a showing of actual prejudice). Rivera contends that the evidence regarding the authenticity of the letter is so dubious that it cannot support the application of the enhancement. That determination, however, was for the sentencing court, and we do not believe that the court's finding that the letter sent by Rivera to Chala, in an attempt to get Chala to lie, was genuine, was clearly erroneous. The court's two-level enhancement for obstruction of justice must stand.

### C. Ovalle's Sentencing Challenges

Ovalle was convicted of the same four drug related charges as Rivera. At sentencing, the court found that the appropriate sentencing guideline was § 2D1.1, and found that the drug quantity attributable to Ovalle was 800 kilograms of cocaine. The court therefore determined Ovalle's BOL to be 40. The court then increased Ovalle's BOL by four levels pursuant to § 3B1.1(b), because it

found that Ovalle was a leader or organizer of a criminal activity involving five or more participants. The court also enhanced Ovalle's BOL by applying a two level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1), because the court found that Ovalle possessed firearms during the commission of the offense. The court determined that the total offense level was 46, and because Ovalle's Criminal History Category was I, he therefore faced a guideline sentencing range of life imprisonment.

### 1. Were the Required Findings Made?

██ Ovalle contends that the district court failed to make the necessary findings at sentencing as required by Fed.R.Crim.P. 32(c)(3)(D). Prior to the imposition of his sentence, Ovalle contended that the PSR was incorrect in that: 1) the offense level of forty (40) based upon the total quantity of drugs involved (800 kilograms) was incorrect because Ovalle was only convicted of possessing 372 kilograms, and the offense level should therefore only be thirty-eight (38); 2) the four level enhancement based upon Ovalle's role as an organizer or leader of a criminal activity was incorrect because the evidence did not establish that he played such a role; and 3) the two level enhancement for possession of firearms was improper because Ovalle never possessed a firearm. Ovalle contends that the quantity of cocaine that was involved, what role he played in the conspiracy, and whether he possessed a firearm, were unresolved factual matters in controversy prior to sentencing, and the court failed to make any findings with respect to these matters prior to sentencing him.

██ When a defendant claims that the PSR contains factual inaccuracies, the district court must make a finding concerning the allegation, or make a determination that no finding is necessary because the court will not take the matter into account at sentencing. Fed.R.Crim.P. 32(c)(3)(D);[9] *United States v. Savoie*, 985 F.2d 612, 620 (1st Cir.

1993); *United States v. Gerante*, 891 F.2d 364, 366–67 (1st Cir.1989). "This protocol serves the dual purpose of protecting the defendant's due process rights and supplying a clear record for future proceedings...." *Savoie*, 985 F.2d at 620; *Gerante*, 891 F.2d at 367. While we have insisted on strict compliance with this rule, we have also found that a court "lawfully may make implicit findings with regard to sentencing matters, incorporating by reference suitably detailed suggestions limned in the [Presentence report] or advanced by a party." *United States v. Tavano*, 12 F.3d 301, 307 (1st Cir.1993) (citations omitted); *see United States v. Cruz*, 981 F.2d 613, 619 (1st Cir.1992); *United States v. Wells Metal Finishing, Inc.*, 922 F.2d 54, 58 (1st Cir.1991).

██ In the present case, after Ovalle had raised his contentions with respect to the PSR, the court heard argument from both parties regarding the appropriate offense level and what increases in the offense level were warranted. The court then stated:

Allright. The Court has heard comments and arguments of counsel and has offered an opportunity of the defendant to address the Court with respect to sentencing.

It is the judgment, therefore, the Court finds that on September the 4th, 1992, the defendant Luis Enrique Ovalle Márquez was found guilty by a jury trial as to counts One, Two, Five and Six of Indictment number—Criminal Indictment Number 91–397.

Based on Guideline 2D1.1 and the amount of cocaine involved in the offense committed a base level of forty (40) was determined. Since the firearm was possessed during the commission of the instant offense an increase of two levels is warranted. As the defendant is perceived as having been an organizer or leader in the overall criminal activity, the base offense

---

**9.** Fed.R.Crim.P. 32(c)(3)(D) provides in pertinent part:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

level is increased by four levels pursuant to Section 3B1.1.

Incidentally, for purposes of the record that is my finding with respect to your arguments.

Based on this record, the court therefore adopted the PSR's recommendations and implicitly found that Ovalle possessed 800 kilograms of cocaine, Ovalle possessed the firearm during the commission of the offense, and Ovalle was an organizer or leader in the criminal activity. The court therefore made the necessary findings in order to adequately comply with Fed.R.Crim.P. 32(c)(3)(D).[10]

### 2. Challenges to the Enhancements

 Ovalle claims that the court erred in determining his sentence by ruling against him with respect to his three sentencing challenges. With respect to Ovalle's first challenge, a four level increase in a defendant's BOL is appropriate where "the defendant was an organizer or leader of a criminal activity that involved five or more participants ..." U.S.S.G. § 3B1.1(a); *See United States v. Sabatino,* 943 F.2d 94, 101 (1st Cir.1991); *United States v. McDowell,* 918 F.2d 1004, 1011 (1st Cir.1990). The application notes to U.S.S.G. § 3B1.1 list seven non-exclusive factors which the court should consider when considering whether a defendant

played a leadership or organizational role as compared to a managerial or supervisory role. These factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, commentary n. 3; *Sabatino,* 943 F.2d at 101. The sentencing court found that Rivera played a leadership or organizational role in this drug smuggling operation, and then enhanced his sentence. The court did not err.

The evidence in the record supports the conclusion that Ovalle orchestrated and organized the logistics of the smuggling plan. The record reasonably indicated that Ovalle was the individual who had the closest links to the source of the cocaine. Ovalle told Monteagudo that the cocaine was coming from Colombia, and it was Ovalle who was privy to the code that would be utilized to communicate with the plane that was coming from Colombia to make the airdrop. After Monteagudo reported to Ovalle and Rivera that he had been forced to throw seven bales

---

**10.** Ovalle also claims that his procedural due process rights were violated by the court's failure to hear his objections to the PSR. Ovalle failed to raise his objections to the PSR in the manner required by District of Puerto Rico Local Rule 418. Local Rule 418.4 provides that "[n]ot later than ten (10) days after disclosure of the Presentence Investigation Report, the attorney for the government and the attorney for the defendant ... shall each file with the Court a written statement of objections to any material facts, sentencing classifications, sentencing guidelines ranges, policy statements, sentencing options ... contained in or omitted [from] the Presentence Investigation Report. Such objections, if any, shall specify with particularity the facts and applications contested. *Any objection not presented in this fashion may not be raised by any party and will not be considered by the sentencing judge at the sentencing hearing."* (emphasis added). Ovalle's counsel only submitted his objections to the probation officer, and he failed to submit his objections to the court. At sentencing, the district court initially stated that because Ovalle had failed to comply with the local rule, the court would not entertain his objections to the PSR. Despite Ovalle's procedural failure and the

court's statement, however, the record shows that the court then permitted Ovalle to advance his objections as arguments to mitigate his sentence. The court then made findings and imposed Ovalle's sentence. Because Ovalle had ample opportunity to challenged the PSR's recommendations, and the court heard and considered Ovalle's contentions regarding sentencing, we do not believe that he was deprived of due process. *See United States v. Romano,* 825 F.2d 725, 729–30 (2d Cir.1987); *cf. United States v. Curran,* 926 F.2d 59, 62 (1st Cir.1991) (stating in dicta that district court has broad discretion to determine the appropriate procedure for availing the defendant of an opportunity to challenge the accuracy of presentence information presented to the district court); *United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir.1990) (holding that government's failure to provide defendant with pre-trial notice that it would seek an enhanced sentence pursuant to the Armed Career Criminal Act did not violate defendant's procedural due process rights where the defendant had the opportunity to contest the record prior to sentencing), *cert. denied,* 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990).

of cocaine overboard because his boat had been pursued by unknown individuals, Ovalle took Monteagudo to a pay phone where Ovalle called a person, who was reasonably presumed to be a higher-up, and had Monteagudo explain what had happened to the cocaine. Additionally, the evidence indicated that Ovalle was involved in all planning stages of the operation, and that Ovalle directed the actions of both Linder and Monteagudo, as well as other co-conspirators. Ovalle also financed various portions of the operation, such as providing money to Linder to repair his boat. These factors all suggest that Ovalle was a leader and organizer of the smuggling operation, and the court did not err in enhancing Ovalle's BOL by four levels.

Ovalle's contentions with respect to the court's determination of the quantity of cocaine involved, and its enhancement based on the presence of a firearm, are analogous to Rivera's challenges, which we have previously addressed. We will not rehash those discussions. Rather, we have reviewed the record and there is ample evidence to support the court's findings that Ovalle was responsible for 800 kilograms of cocaine, and that he possessed a firearm in connection with the drug offense. The court's sentencing determinations were not clearly erroneous.

For the foregoing reasons, the decision of the district court is *affirmed*.